**RHODE ISLAND COMMITTEE ON ENERGY et al., Plaintiffs, Appellants,**

**v.**

**GENERAL SERVICES ADMINISTRATION et al., Defendants, Appellees.**

No. 76–1530.

United States Court of Appeals,
First Circuit.

Argued March 8, 1977.
Decided Aug. 16, 1977.

398

Myron M. Cherry, Chicago, Ill., with whom Peter A. Flynn, Chicago, Ill., and Thomas C. Mullaney, Jr., Providence, R. I., were on brief, for plaintiffs, appellants.

John J. Zimmerman, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Washington, D. C., Lincoln C. Almond, U. S. Atty., Everett C. Sammartino, Asst. U. S. Atty., Providence, R. I., Edmund B. Clark, and Irwin L. Schroeder, Jr., Attys., Dept. of Justice, Washington, D. C., were on brief, for defendants, appellees.

Felice D. Cohen and Richard E. Ayres, Washington, D. C., were on brief for The Fund for Constitutional Government, the Natural Resources Defense Council, Inc., and the Friends of the Earth, amici curiae.

Edward F. Hindle, Matthew F. Medeiros, Edwards & Angell, Providence, R. I., and Beveridge, Fairbanks & Diamond, Washington, D. C., were on brief for New England Power Co. and the Narragansett Elec. Co., amici curiae.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Rhode Island Committee on Energy and individuals residing near the Charlestown Naval Auxiliary Landing Field (NALF) in Rhode Island filed suit in late 1974 to block the impending sale by the General Services Administration (GSA) of the "surplus" Navy site to the Narragansett Electric Company which plans to build a nuclear power plant on the property. They sought a declaration that the sale to the power company would violate the National Environmental Policy Act (NEPA), the Council on Environmental Quality's guidelines and GSA's own guidelines for complying with NEPA. They sought also a declaration that the sale would violate provisions of the Federal Property and Administrative Services Act (FPAS), 40 U.S.C. §§ 471 *et seq.*, inasmuch as GSA had ignored a request by the Department of the Interior that it be permitted to use the NALF site as a wildlife refuge, and did not comply with FPAS public notice and competitive bidding requirements. Plaintiffs further requested,

"a permanent injunction preventing GSA from accepting the bid of Narragansett Electric Co. . . . and restraining the GSA from taking any steps independently or in concert with any other federal agency or Narragansett Electric Co. to implement said proposed sale . . . unless and until there is demonstrated compliance with all applicable provisions of [NEPA] . . . and the [FPAS]."

On July 8, 1975, the district court issued a comprehensive opinion indicating that GSA had been both remiss and extraordinarily cavalier in its handling of the disposal of the property. The court stated that it would enjoin defendants "from taking any further action with regard to the proposed disposal to Narragansett until they have prepared and circulated a draft environmental impact statement and filed a final EIS in accordance with NEPA and applicable regulations." 397 F.Supp. 41, 61–62.

However, while willing to afford relief under NEPA, the court thought that plaintiffs' challenge based on GSA's alleged violations of the FPAS was not justiciable. As residents of the area surrounding the Naval facility, plaintiffs would suffer "injury in fact" from its disposal to Narragansett, but their interest in the future ownership and use of the site was held not to be within the "zone of interests" arguably protected by the FPAS. *Id.* at 53–54, *citing Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

Plaintiffs did not submit a proposed injunctive order to the court but moved to amend their pleadings. They sought to add the Department of the Interior as an involuntary plaintiff and asked for an injunction requiring GSA to turn over to Interior the portion of the NALF site which Interior had requested to use as a wildlife refuge. Interior resisted joinder on grounds that it preferred to await a final EIS before pressing for conveyance of the site, and, in any event, would assert its claim against GSA through the Attorney General rather than through a lawsuit. The court refused to join Interior. 411 F.Supp. 323, 326–27 (1976). However, it announced that some further exploration of the FPAS claim was in order as "the Court cannot simply order GSA to prepare an EIS without first exploring the possibility that, due to [Interior's] assertedly paramount interest in the NALF, no EIS either as to the entire NALF, or as to any part of it, is required by NEPA." *Id.* at 327. It therefore posed several questions to counsel. *Id.* at 328. Counsel were asked, in particular, whether the court could order an EIS where the FPAS might make it mandatory that GSA transfer the site to Interior. A few months later, after submissions from counsel, the court issued a third opinion.[1] It ruled that as the FPAS vested GSA with some measure of discretion in determining who receives a site, an EIS was an appropriate pre-decision step which was consistent with the FPAS. The court entered a final order

---

1. The third opinion of the district court, issued on August 24, 1976, is unpublished.

which, inter alia, declared that sale of the site to Narragansett without preparation of an EIS constitutes a violation of NEPA. However, it denied a permanent injunction "in view of GSA's clearly expressed intention to prepare an EIS without further delay . . . .." The court also dismissed the FPAS elements of the complaint because of plaintiffs' lack of standing, dismissed the complaint as against the United States (leaving GSA and its administrator as parties) and denied plaintiffs' request for attorney's fees.

Plaintiffs appeal from all aspects of the order except the declaration relating to the sale to Narragansett. They also challenge the earlier refusal to join Interior as a party.

We deal first with plaintiffs' right to maintain a claim under the FPAS to the effect that GSA had to offer the land to Interior, a federal agency, in preference to selling to the utility. The Federal Property and Administrative Services Act was enacted in 1949 to establish an "economical and efficient system" for the procurement, utilization and disposal of real and personal property. *See* 40 U.S.C. § 471. It defines "excess property" as "any property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof." *Id.* § 472(e). "Surplus property" is defined as "any excess property not required for the needs and the discharge of the responsibilities of all Federal agencies, as determined by the Administrator [of GSA]." *Id.* § 472(g). The Administrator "shall provide for the transfer of excess property among Federal agencies" and he may determine "the extent of reimbursement for such transfers of excess property". *Id.* § 483(a). And, in § 484 the Act provides that the "Administrator shall have supervision and direction over the disposition of surplus property", and established guidelines for disposal by bid or negotiations.

■ Appellants argue that the FPAS should be interpreted as requiring the Administrator of GSA, subject to a very limited exercise of discretion, to convey "excess property" to a requesting federal agency. They maintain that Interior's request for the NALF site entitled it to the property and that the district court should have ordered such a conveyance.

We agree with the district court that plaintiffs have no standing to challenge the asserted violation of the FPAS. Even under the liberalized concept of standing to challenge administrative actions developed in *Association of Data Processing Service Organizations v. Camp, supra,* the plaintiffs have failed to show that their claim falls within the "zone of interests" arguably protected by the FPAS.

■ The minimum constitutional requirement for standing is that a party bringing suit have suffered or be threatened with suffering "injury in fact." A threshold showing of such injury is necessary to insure compliance with Article III's limitation of jurisdiction to "Cases" and "Controversies." *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). We agree with the district court that plaintiffs meet this minimum requirement. The establishment of a nuclear power plant near their residences would affect their "[a]esthetic and environmental well-being," a detriment sufficient to constitute "injury in fact."[2] *Sierra Club v. Morton,* 405 U.S. 727, 734, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). It is also clear that the environmental harm feared by plaintiffs will follow directly from GSA's conveyance to Narragansett and that the harm will be alleviated by a conveyance to Interior. Hence the relief sought is sufficiently likely to cure the feared injury to give rise to a justiciable case or controversy. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 44–46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

2. Plaintiffs also claimed in their complaint that construction of the nuclear facility would cause them economic injury.

But while the claim presented under the FPAS is thus justiciable in a constitutional sense, we must ask whether Congress has given this plaintiff the right to invoke the judgment of a federal court on the issue of the legality of GSA's conduct under the FPAS. The relevant statute is 5 U.S.C. § 702, which provides:

"A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a *relevant* statute, is entitled to judicial review thereof." [Emphasis supplied.]

This section was said in *Association of Data Processing Service Organizations, supra,* to confer standing only on parties whose threatened interest "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. *See Sierra Club v. Morton, supra,* 405 U.S. at 733, 92 S.Ct. 1361.

The Supreme Court has not provided a great deal of guidance in defining the boundaries of a statute's "zone of interests." In *Barlow v. Collins,* 397 U.S. 159, 164–65, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), the Court suggested that the touchstone is whether Congress can be understood as having intended to protect the plaintiff's interest in enacting the statute in question. And in *Association of Data Processing Service Organizations, supra,* the Court stated that the proper inquiry was whether the plaintiff was "within the class of persons that the statutory provision was designed to protect." 397 U.S. at 155, 90 S.Ct. at 831.

*See also Rental Housing Association of Greater Lynn v. Hills,* 548 F.2d 388, 390 (1st Cir. 1977) (plaintiff need only be an intended, not a primary, beneficiary of the statute). One commentator suggests that "any class of interests which the administrator is required by statute (either implicitly or explicitly) to consider in framing agency policy is entitled to standing" under the APA. Stewart, "The Reformation of American Administrative Law," 88 Harv.L.Rev. 1667, 1726–27 (1975).

■ Whatever the precise formula, plaintiffs do not fit under any of the foregoing. Nowhere in the FPAS statute or in the committee reports[3] accompanying its 1949 enactment and 1952 amendments can we discern any congressional solicitude for the interests of abutters or nearby residents of real property which has become excess or surplus. In a similar vein, we find no implicit or explicit direction in the statute or its legislative history that GSA pay particular attention to interests such as appellants' in deciding how to dispose of an excess or surplus site. At most the statute guides the GSA's actions in choosing among federal, public and private entities requesting the conveyance of excess or surplus property. While a disappointed bidder might conceivably have standing to challenge the sale to Narragansett, *see, e. g., Merriam v. Kunzig,* 476 F.2d 1233, 1242–43 (3d Cir.), *cert. denied sub nom. Gateway Center Corp. v. Merriam,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973), a resident of the surrounding area does not.[4]

---

**3.** H.R.Rep.No.670, 81st Cong., 1st Sess. (1949), reprinted in 2 U.S.Code Cong.Serv. at p. 1475 (1949); S.Rep.No.338, 81st Cong., 1st Sess. (1949); S.Rep.No.2075, 82d Cong., 2d Sess. (1952), reprinted in 2 U.S.Code Cong. & Admin.News at p. 2121 (1952); H.R.Rep.No. 1524, 82d Cong., 2d Sess. (1952).

**4.** Appellants' suggestion that they need only show injury in fact and then may "argue the public interest in support of [their] claim that the agency has failed to comply with its statutory mandate", *Sierra Club v. Morton,* 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972), is without merit. Congress may undoubtedly allow persons suffering injury in fact to challenge agency action causing that injury

irrespective of whether the interest harmed is within the statutory "zone of interests" as ordinarily understood. (This is just another way of saying that Congress may define the "zone of interests".) Congress has so extended standing to the constitutional limits in the Communications Act, 47 U.S.C. § 402(b), which provides that "any . . . person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any [license] application" may appeal from the FCC's order. *See Scripps-Howard Radio, Inc. v. FCC,* 316 U.S. 4, 14, 62 S.Ct. 875, 86 L.Ed. 1229 (1943); *FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 477, 60 S.Ct. 693, 84 L.Ed. 869 (1940). But no specific grant of standing to plaintiffs beyond the "zone of interests" as

After the district court ruled that appellants could not assert a violation by GSA of the FPAS, they sought to join Interior as a involuntary plaintiff and to compel a conveyance of the NALF site to Interior. We think that the district court was correct in denying these requests.

Fed.R.Civ.P. 19(a) provides for joinder of a party where "(1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

Since the district court correctly concluded that appellants had standing only to challenge the sale to Narragansett for failure to comply with NEPA, Interior's interest in the NALF site is not involved in this suit. Hence, Interior's presence is not necessary for "complete relief" to be afforded the parties in this action. For similar reasons, subsection (2) does not come into play: Interior has no "interest" which the suit properly adjudicates.

Although the district court correctly held that appellants had no standing to challenge the sale on grounds that it violated the FPAS, it nonetheless proceeded to

construe the statute. Relying on *Flint Ridge Development Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), the court felt it had to determine whether the FPAS mandated transfer of the NALF site to Interior without an exercise of the GSA Administrator's discretion since if the statute divested the Administrator of discretion then "order[ing] GSA to prepare an EIS" would "require GSA to act in a manner contrary to controlling law." The court accordingly reviewed the statute at some length and determined that the FPAS vested GSA with discretion to refuse to convey excess property to a federal agency. Since GSA could exercise discretion in determining how to dispose of the NALF site, an EIS was held to be required to guide the exercise of its judgment. The court entered a declaratory order stating that GSA was obliged under NEPA to complete the EIS process before conveying to Narragansett.

Appellants vigorously dispute the court's reading of the FPAS. They further argue—contrary to their position throughout this suit—that no EIS need be filed. They reason that since a transfer to Interior was statutorily mandated, GSA had no discretion in the matter, and it therefore need not develop an EIS. Appellants argue further that the district court should have instead concluded that the FPAS required a transfer to Interior and should have ordered such

ordinarily understood accompanies the FPAS. And given the strong interests of the agencies and other potential transferees of government property in defining and protecting their own interests we are unable easily to impute to Congress an unstated intention to permit neighbors to assert, unbidden, the interests of the affected agencies.

We also reject appellants' suggestion that the "zone of interests" of the FPAS includes their interest in seeing tax dollars wisely spent. *Cf. Ballerina Pen Co. v. Kunzig,* 140 U.S.App.D.C. 98, 433 F.2d 1204, 1208 (1970); *Blackhawk Heating & Plumbing Co. v. Driver,* 140 U.S. App.D.C. 31, 433 F.2d 1137, 1140–41 (1970). All federal statutes establishing standards for agency use of resources are presumably enacted with efficiency in mind. If courts were to interpret these laws as bringing taxpayers' interests in efficiency within such statutes' "zone

of interests" then virtually any injured citizen would have standing to challenge agency action. Such a construction would effectively do away with the APA's separate requirement that a challenge to agency action may be brought only by one within the statute's zone of interests. Moreover, an injury to one's interest as a taxpayer in efficient governmental use of resources does not in all cases even constitute "injury in fact." *See, e. g., Frothingham v. Mellon,* 262 U.S. 447, 487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). *But see Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In the present case, the injury asserted is to appellants' aesthetic and economic interests as residents of the Charlestown area, interests which differ from, and might conflict with, their interests as taxpayers concerned with GSA's alleged violations of the FPAS.

a conveyance. The Government, on the other hand, agrees with the district court's construction of the FPAS and argues further that an additional agency, EPA, has expressed an interest in the same acreage sought by Interior. Thus, GSA argues, an EIS is necessary to enable it to exercise discretion intelligently in choosing between Interior and EPA.

We see no occasion in this litigation to resolve these anomalous arguments. In our view, the district court went too far when it undertook, even for a limited purpose, to pass on whether or not the FPAS mandated a conveyance to Interior. The court misconstrued the nature of the relief sought as an "order [that] GSA . . . prepare "an EIS". In reality, plaintiffs sought only an injunction preventing GSA from accepting the bid of . . . Narragansett Electric Co. . . . unless and until there is demonstrated compliance with all applicable provisions of [NEPA] . . . ." The court's own final declaratory order went no further. Nowhere in their complaint or amended complaint did appellants seek an order requiring an EIS under other circumstances. Under both the injunction sought and the declaratory order actually issued, GSA remains free to fulfill its alleged duty under the FPAS to convey to Interior. What it may not do is sell to Narragansett without an EIS. There was no such conflict between the terms of the actual or proposed order and FPAS as to require the district court to reconcile the two. Compare Flint Ridge Development Co., supra. And since plaintiffs lack standing to assert Interior's rights (and Interior, anyway, acquiesces in an EIS) there was no reason to decide the FPAS issue.

Not only was it unnecessary, it was undesirable—because of the importance of the question and the potential impact of the court's decision on parties not before it, including the Attorney General should the question come before him—for the district court to have embarked upon the FPAS issue. We make it clear that the interpretation of FPAS is for another day and another case. Where, as here, the district court need not and should not have reached the question of GSA's discretion under the FPAS, its opinion on that issue is without legal effect: in all respects the question remains open and unresolved both at the district and circuit levels. *See W. W. Windle Co. v. Commissioner,* 550 F.2d 43, 46 (1st Cir. 1977).

Until the initiation of appellants' suit, GSA was singlemindedly proceeding with preparations for a sale to Narragansett, giving little or no consideration to the legal constraints under which it supposedly operates including its NEPA obligations. The district court praised plaintiffs for bringing this improper conduct into court, but was of the opinion that it lacked authority to grant attorney's fees against either the Administrator or GSA, citing 28 U.S.C. § 2412.

> "Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title but not including the fees and expenses of attorneys may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or official of the United States acting in his official capacity . . . ."

The court went so far as to speculate that § 2412 might be read to allow assessment of fees against a federal official who had acted in bad faith, on the ground that such a person was not "acting in his official capacity." But even under that rather exotic theory,[5] attorney's fees were ruled out here, for "there is not sufficient evidence to show that the Administrator personally directed or acquiesced in a course of conduct to evade NEPA requirements." 397 F.Supp. at 62 n. 33.

Appellants do not now contest the district court's denial of fees as against the defend-

---

5. While the issue is not before us on appeal, we cannot understand how a United States official sued in his official capacity, as was true here, can be said to cease acting in his official capacity within § 2412 because it is shown that the conduct complained of was in bad faith. This is not a situation where officials are being sued for private torts arising incidental to official conduct.

ant Administrator, but they argue that a "bad faith" exception to § 2412 should be carved out with respect to GSA itself. They say that such an exception is "well-recognized" but neither case cited by appellants acknowledges the existence of such an exception. In *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme court noted that attorney's fees may be awarded by a federal court where "the losing party has 'acted in bad faith, vexatiously, wantonly or for oppressive reasons' ". *Id.* at 258–59, 95 S.Ct. at 1622, *quoting F. D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). But the Court there was discussing, in the context of an award of attorney's fees against a private party, the "bad faith" exception to the "American rule" that attorney's fees are not to be awarded to a prevailing party. The Court nowhere suggested that § 2412's prohibition of attorney's fees contained, by implication, a bad faith exception. Later in its opinion, the Court rejected the suggestion that a "private attorney general" exception existed to § 2412, which "on its face, and in light of its legislative history, generally bars such awards, which, if allowable at all, must be expressly provided for by statute . . ." *Id.* 421 U.S. at 267–68, 95 S.Ct. at 1626. We are also at a loss to understand appellants' reliance on our opinion in *Committee on Civic Rights v. Romney,* 518 F.2d 71 (1 Cir. 1975), where we rejected a claim for attorney's fees against *private* and *municipal* defendants based on a "private attorney general" theory. Nowhere in that case did we suggest that a judicially created exception to § 2412 existed.

 By its literal terms § 2412 admits of no judicially fashioned "bad faith" exception. Only exceptions "specifically provided by statute" will subject the United States or its agencies to liability for attorney's fees. *See Alyeska Pipeline Co., supra,* 421 U.S. at 267–68, 269 n. 44, 95 S.Ct. 1612; *Natural Resources Defense Council v. EPA,* 484 F.2d 1331, 1334–35 (1st Cir. 1973). Section 2412 is a limited waiver of sovereign immunity and as such its "limitations and

conditions . . . must be strictly observed and exceptions thereto are not to be implied." *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957). *See generally,* P. Bator et al., Hart & Wechsler's The Federal Courts and The Federal System 1351–56 (1973 ed.). Congress has authorized no "bad faith" or other basis for awarding attorney's fees against the Government in this case. The district court was therefore correct in refusing to award attorney's fees against GSA.

 We find no abuse of discretion in the district court's refusal to issue an injunction. The court believed GSA's representations that it was proceeding in good faith to comply with NEPA and was evidently fortified in this belief by GSA's attempts to comply with the court's first opinion, of July 8, 1975, holding GSA bound to prepare an EIS. Appellants had the burden of showing that GSA's bad faith or other circumstances required issuance of an injunction and we cannot say that the district court erred in denying such relief. *See Poe v. Gerstein,* 417 U.S. 281, 94 S.Ct. 2247, 41 L.Ed.2d 70 (1974) (per curiam); *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *United States v. Oregon State Medical Society,* 343 U.S. 326, 333–34, 72 S.Ct. 690, 96 L.Ed. 978 (1952). *Cf. Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Our affirmance on this point is of course without prejudice to the district court's right to entertain a prayer for an injunction should plaintiffs establish to its satisfaction in the future that GSA is not complying with its obligations under the judgment. *See* 28 U.S.C. § 2202.

The district court's dismissal of the United States on grounds of sovereign immunity preceded the enactment of Pub.L.No.94–574, *amending* 5 U.S.C. § 702, waiving sovereign immunity where only declaratory or injunctive relief is sought. The United States has now consented to be joined as a party to the declaratory order and we remand to the district court so that the Unit-

ed States may be so joined. In all other respects, the judgment is affirmed.

*So ordered.*