Lothar E. S. BUDIKE, Plaintiff,

v.

Hon. Philip KLUTZNICK, Secretary of Commerce, and Hon. Samuel B. Nemirow, Asst. Secretary for Maritime Affairs, Defendants,

United States Cruises, Inc., Intervenor-Defendant.

Civ. A. No. 80–1790.

United States District Court, E. D. Pennsylvania.

March 31, 1981.

David W. Marston, Kirk T. Karaszkiewicz, Philadelphia, Pa., for plaintiff.

James Sheehan, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

William N. Myhre and William R. Meyer, Preston, Thorgrimson, Ellis & Holman, Washington, D. C., for intervenor-defendant.

**MEMORANDUM AND ORDER**

DITTER, District Judge.

This is an action to invalidate the sale of the vessel S.S. United States by the Maritime Administration of the Department of Commerce ("MarAd") to the intervenor-defendant, United States Cruises, Inc. ("U.S. C.I."). U.S.C.I. has moved for summary judgment on the ground that plaintiff is without standing to maintain the suit.[1]

Pursuant to authorization contained in 46 U.S.C. § 1160, MarAd purchased the S.S. United States from its former owner on February 6, 1973.[2] Between that date and the date of the vessel's eventual sale to U.S.C.I., MarAd repeatedly solicited bids for the purchase of the ship but was unable to find a suitable buyer.[3] On April 18, 1978, MarAd published in the Federal Register Invitation for Bids No. PD–X–1029, setting the minimum price at $5,000,000.00, payable in cash within 30 days of the acceptance of the successful bid. The invitation further specified that each bid was to be accompanied by a deposit in the amount of 10 per cent. In the event that the successful bidder was unable to execute the sales contract within the 30 day period prescribed by the invitation, the 10 per cent deposit was to be surrendered to the government.

No satisfactory responses were received. On November 9, 1973, MarAd published Invitation for Bids ("IFB") No. PD–X–969 which set a minimum purchase price of $12,100,000.00 and required the submission of a nonrefundable 10 per cent bid deposit. On August 11, 1975, IFB No. PD–X–999 was published which lowered the minimum bid price to $7,500,000.00 but retained the required 10 per cent nonrefundable deposit. Thereafter, Congress amended 46 U.S.C. § 1160 to permit the sale of the S.S. United States for use as a floating hotel in or on the navigable waters of the United States. Pub.L. 94–536, 90 Stat. 2497 (1976). Pursuant to this amendment, MarAd then published IFB PD–X–1013 on December 3, 1976. The minimum bid price was further reduced to $5,000,-000.00 but, once again, the 10 per cent nonrefundable down payment was required. As with PD–X–1029, none of the bids submitted in response to these invitations were deemed responsive by MarAd and were therefore rejected.

---

1. Defendants Klutznick and Nemirow have formally joined in U.S.C.I.'s motion for summary judgment. Accordingly, the motion will be treated as though filed by all defendants.

2. By virtue of Pub.L. 92–296, § 2, 86 Stat. 140 (1972) (codified at 46 U.S.C. § 1160), the Secretary of Commerce was authorized to purchase the S.S. United States "for layup in the National Defense Reserve Fleet and operation for the account of any agency or department of the United States during any period in which vessels may be requisitioned under section 902 of the Merchant Marine Act, 1936 and/or for sale or charter to a qualified operator under the American flag." Following several unsuccessful attempts to sell the vessel under this statutory provision, Congress amended it to authorize the ship's sale "for use as a floating hotel in or on the navigable waters of the United States." Pub.L. 94–536, 90 Stat. 2497 (1976). See Discussion in Note 3, infra.

3. The record reflects that on February 26, 1973, MarAd published a notice soliciting proposals for the purchase or charter of the ship.

In response to PD–X–1029, the plaintiff submitted a sealed bid wherein he offered $3,250,000.00 for the purchase of the vessel and enclosed a check in the amount of $325,000.00 representing the required deposit. U.S.C.I. and five other prospective buyers submitted bids in excess of the $5,000,000.00 minimum purchase price. MarAd rejected each of these bids as unresponsive to the terms of the bid invitation.[4] Subsequently, U.S.C.I. and MarAd engaged in negotiations which culminated in the execution of a contract for the sale of the vessel.[5]

Budike then commenced the instant action[6] seeking to invalidate the sale as being in violation of the Federal Property and Administrative Services Act, 40 U.S.C. § 471 et seq. Specifically, he contends that 40 U.S.C. § 484(i), pertaining to the disposal of surplus vessels of 1,500 gross tons or more, incorporates the provisions of the Merchant Marine Act of 1920 which requires "public or private competitive sale after appraisement and due advertisement." 46 U.S.C. § 864. Budike asserts that by privately negotiating with U.S.C.I. and by refusing to permit him to negotiate competitively for the purchase of the vessel, MarAd violated the requirement that such a transaction occur pursuant to "public or private competitive sale."

Following extensive discovery, defendants filed the present motion for summary judgment in which they argue that Budike lacks standing to maintain this action. The basis of defendants' position is that at no time did Budike evince a willingness or ability to meet those terms of the bid invitation which were invariable: a $5,000,000.00 purchase price accompanied by a 10 per cent nonrefundable down payment. It is defendants' contention that as long as Budike was unwilling to meet these terms, the government would not have considered selling him the vessel. Hence, even assuming that MarAd secretly negotiated with U.S.C.I. and excluded Budike from such negotiations, there does not exist a "fairly traceable causal connection between the claimed injury and the challenged conduct", Duke Power Company v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978), and the plaintiff lacks standing. Budike counters this argument in two ways. He asserts first that there is sufficient evidence on the record to raise a genuine issue of fact as to whether he was willing to meet the government's minimum terms for the sale of the ship or whether those terms were immutable as alleged by the defendants. Second, he contends that as a "disappointed bidder" within the meaning of Merriam v. Kunzig, 476 F.2d 1233 (3d Cir.), cert. denied, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973), and subsequent cases, he possesses standing as a matter of law to challenge MarAd's conduct. For reasons slightly different than those advanced by the parties, I will deny U.S.C.I.'s motion.

It is firmly established that the moving party in a motion for summary judgment must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); Adickes v. S. H. Kress and Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Drexel v. Union Pre-

---

**4.** U.S.C.I.'s bid was determined to be unresponsive because it was not accompanied by a check in the amount of the required deposit.

**5.** The contract was executed on September 29, 1978. Under its terms, U.S.C.I. agreed to pay $5,000,000.00 for the vessel, submitted a $500,000.00 down payment which was to be retained by the government in the event of a default and agreed to accept delivery within 30 days of the execution of the contract. The delivery date was extended on several occasions by agreement of the parties to the contract.

**6.** The plaintiff originally sought a temporary restraining order to prevent delivery of title to the vessel from MarAd to U.S.C.I. At a conference held on May 12, 1980, counsel for Klutznick and Nemirow represented that MarAd would grant U.S.C.I.'s request for a 300 day extension of the delivery date, then set for May 21, 1980. Plaintiff then withdrew his application for a temporary restraining order. On March 20, 1981, the parties stipulated that U.S. C.I. would take title to the ship but that neither it nor the government would assert a defense of mootness in this action on the basis of the transfer of title.

scription Centers, Inc., 582 F.2d 781, 784 (3d Cir. 1978). Further, all evidence and the inferences drawn therefrom must be considered in a light most favorable to the party opposing the motion. *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 131 (3d Cir. 1978) quoting *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

▮ Unfortunately, the principles governing the law of standing are neither as concisely summarized or as well settled.[7] Standing to challenge action by an administrative agency is governed by section 10 of the Administrative Procedure Act, 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The essential prerequisite for standing under this provision is a showing that the administrative action has caused the plaintiff "injury in fact, economic or otherwise" to an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organization v. Camp,* 397 U.S. 150, 152–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970); *Americans United for Separation of Church and State, Inc. v. United States Department of Health, Education and Welfare,* 619 F.2d 252, 256 (3d Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 1345, 67 L.Ed.2d 332 (1981). For the purpose of resolving this motion, it is important to observe that in order to have standing, the plaintiff must not only suffer "a distinct and palpable injury" *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197,

2206, 45 L.Ed.2d 343 (1975), but must also establish "a fairly traceable causal connection between the claimed injury and the challenged conduct" such that "the exercise of the Court's remedial powers would redress the claimed injury." *Duke Power Company v. Carolina Environmental Study Group, Inc., supra,* 438 U.S. at 72, 74, 98 S.Ct. at 2630, 2631.

It remains to apply these principles to the facts of this case. In so doing, it is necessary at the outset to isolate the injury claimed by the plaintiff and the remedy which he seeks in bringing this action. Budike alleges that following MarAd's rejection of the bids submitted in response to PD–X–1029, he made repeated attempts to negotiate with agency officials for the purchase of the ship but was arbitrarily precluded from doing so. *Complaint* ¶¶ 16, 18. He further contends that during this same period of time, MarAd was secretly conducting negotiations with U.S.C.I. *Complaint* ¶ 17. Thus, the injury which Budike seeks to redress is his allegedly arbitrary and unlawful exclusion from the process of negotiation which ultimately led to the sale of the vessel. He does not ask the court to compel the ship's sale under any specific conditions or terms but only to invalidate the contract entered into between MarAd and U.S.C.I.

In support of their contention that the plaintiff lacks standing under these circumstances, defendants rely heavily upon *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708 (D.C.Cir.1977), in which a trade association representing dealers of used industrial equipment sought to invalidate the negotiated sale of certain industrial property by the General Services Administration to Lockheed. Acting as a representative of its

---

7. The murkiness of the principles governing the doctrine of standing has been extensively criticized by both courts and commentators. This area of the law has been described as "a mass of confused logic-chopping about bewildering technicalities." Davis, *Standing: Taxpayers and Others,* 35 U.Chi.L.Rev. 601, 628 (1968); as "this complicated specialty of federal jurisdiction." *United States ex rel. Chapman v. Federal Power Commission,* 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918 (1953) and

as a "morass." *Richardson v. United States,* 465 F.2d 844, 865 (3d Cir. 1972) (Adams, J. dissenting), *rev'd,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). More recently, Professor Davis has observed that the "whole law of standing is so confused and cluttered ... that the lower courts and practitioners especially need Supreme Court guidance." K. Davis, Administrative Law of the Seventies § 22.00–01, at 167 (Supp.1977).

member firms, the trade association alleged that "[a]s potential purchasers of some of the property which was sold to Lockheed and as potential sellers of used machinery to Lockheed . . . [its members] suffered economic harm as a result of the illegal acts of GSA." *Id.* at 711. Affirming the district court's dismissal of the complaint, the Court held that this allegation, without more, was insufficient to establish that the plaintiff's member firms had suffered a direct, non-speculative injury as a result of the putatively illegal conduct of the government agency:

> . . . MDNA may challenge the failure to advertise for competitive bidding only upon demonstration that its members presently participate in or contemplate participation in a viable business project which had adequate resources and an existent intent to purchase property such as Plant No. 14 as a whole. No such project or intent was alleged by MDNA in its complaint which claimed only that its members were interested in purchasing "some of the property sold to Lockheed." The depositions of MDNA's officers only raised the possibility that a group of members might organize and, with the possible involvement of unnamed real estate investors, might together have adequate resources to bid competitively for Plant No. 14 as a whole. No details are given. Not even one MDNA member possessing or participating in a group which possessed both adequate assets and an existent intent to bid effectively on Plant No. 14 is identified. Therefore, we hold that MDNA has failed to demonstrate that any of its members come within a class whose injuries caused by GSA's failure to advertise this sale for competitive bidding are of "sufficient immediacy and ripeness to warrant judicial intervention." *Warth v. Seldin, supra,* 422 U.S. at 516, 95 S.Ct. at 2214; *California Bankers Ass'n v. Shultz,* [416 U.S. 21,

67–69, 94 S.Ct. 1494, 1520–21, 39 L.Ed.2d 812 (1974)]

*Id.* at 718–19 (footnote omitted).

The holding in *Lockheed* is not dispositive of the issues raised in this case. The crux of the Court's ruling was that the plaintiff had failed to establish that any of its members possessed "adequate assets and an existent intent to bid effectively" and therefore had suffered only a speculative, remote possibility of injury as a result of the agency's conduct. *Id.* at 719. Here, by contrast, there is no question that Budike *did* bid, albeit unresponsively and unsuccessfully, on the purchase of the S.S. United States. Similarly, there is evidence to support his contention that following the rejection of his bid, he sought to negotiate with MarAd officials for the sale of the vessel. Unlike the used machinery dealers in *Lockheed,* Budike made repeated, concrete efforts, first to bid and then to negotiate for the purchase of the property in question. His standing to challenge its sale to U.S.C.I. must be evaluated in that context.

I am unable to agree with the defendants' assertion that Budike's supposed failure to meet the "immutable" sales terms, a $5,000,000.00 purchase price combined with a nonrefundable 10 per cent down payment, deprives him of standing to challenge the vessel's sale to U.S.C.I. It must be remembered that the plaintiff is not challenging the rejection of his bid in July of 1978, nor is he seeking to compel the agency to sell him the ship on any specified terms. Rather, he is contending that he was refused the opportunity, allegedly mandated by statute, to negotiate competitively. While the concept of literal responsiveness to the terms of a government solicitation is appropriate in the context of an advertised bidding procedure, it has far less significance in a negotiated agreement which, by definition, calls for a more flexible approach in setting the terms of a transaction. *See Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 435 n. 5 (3d Cir. 1979)[8]. Accordingly, the pertinent inquiry here is not whether the plain-

---

8. This was tacitly conceded by the MarAd official who conducted the negotiations for the government agency, Mr. Ray H. Yowell. When asked to describe his function in the negotia-

tions, he stated that "[m]y role was to negotiate the best and most favorable terms to the government and make a recommendation to [his superiors]." (N.T. Yowell).

tiff has established his compliance with every detail of the government's invitation to bid. Rather, it is whether he has introduced evidence to support his contention that he attempted to conduct serious negotiations so that MarAd's refusal to permit him to do so constituted a direct, concrete injury upon which standing may be premised. A review of the record convinces me that he has. With the exception of the requirement that a bidder put up a nonrefundable 10 per cent down payment,[9] the evidence shows that Budike made known his willingness to purchase the vessel on terms which substantially comported with those demanded by the government. For example, Budike testified in his deposition that he went to MarAd's offices in August, 1978, and indicated his willingness to offer $5,000,000.00 for the ship:

Q. On August twenty-second, you're saying at this meeting you told them that now you would bid five million, is that right?

A. Yes. "Get me your bosses," you know. You know, "Get me the people so we can talk and sit down, and I'm going to offer you five million bucks."

Q. Why were you willing to increase your offer?

A. Why? Okay, because now I could sit down with the people. It was no longer a fire trap here.

Q. Referring to . . .

A. PD–X–1029. The man said there (sic) main concern was that five million dollar figure. I said, "All right," as a businessman I'm talking now, okay, as a businessman, "All right, let's sit down and talk business now. And you're telling me that all the negotiations is still going to be per PD–X–1029." I said, "All right, I'll give you the five million bucks. Just, all right, just get the meeting going."

(N.T. Budike 82–83).

■ Further, Budike testified that he conveyed to MarAd officials his amenability to accepting the ship on an "as is, where is basis" and, in general, to conform to the requirements of PD–X–1029. (N.T. Budike 166–68). In view of this evidence, I conclude the plaintiff has sufficiently established that he possessed the willingness to purchase the S.S. United States on terms which were substantially in accord with those the government was seeking and that he communicated this willingness to MarAd officials. Thus, MarAd's alleged refusal to negotiate with Budike while secretly conducting negotiations with U.S.C.I. which resulted in the sale of the vessel on terms similar to those being offered by the plaintiff constituted a sufficient injury in fact to give Budike standing to maintain this action.

■ However, the standing analysis mandated in *Association of Data Processing Service Organizations v. Camp, supra*, requires an inquiry into an area not addressed by the parties—whether the interests asserted by the plaintiff are arguably within the zone of interests to be protected by the statutes in question. As previously noted, Budike contends that MarAd's actions were in violation of the Federal Property and Administrative Services Act (FPAS), 40 U.S.C. §§ 471 *et seq.*, and the pertinent provisions of the Merchant Marine Acts which are referred to therein. The difficult issue posed by this assertion is whether the plaintiff's claim falls within the "zone of interests" arguably protected by this statutory scheme. I conclude that it does.

The FPAS was enacted in 1949 to establish an "economical and efficient system" for the procurement, utilization, and disposal of real and personal property by the government. *See* 40 U.S.C. § 471; *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397, 401 (1st Cir. 1977). The guidelines for disposal of surplus property by bid or negotiation

---

**9.** Budike testified that he was prepared to put up $1,000,000.00 as down payment contingent upon his obtaining financing within ninety days. If he could not come up with the $4,000,- 000.00 balance within the ninety days, he wanted the down payment to be returned (N.T. Budike 167–68; 204).

are set forth in 40 U.S.C. § 484 which also specifies that "except as otherwise provided in this section, the Administrator [of the General Services Administration] shall have supervision and direction over the disposition of surplus property." The plaintiff's action is premised in part on 40 U.S.C. § 484(i) which provides:

The United States Maritime Commission shall dispose of surplus vessels of one thousand five hundred gross tons which the Commission determines to be merchant vessels or capable of conversion to merchant use, and such vessels shall be disposed of only in accordance with the provisions of the Merchant Marine Act, 1936, as amended, and other laws authorizing the sales of such vessels.

The clear purpose of the Merchant Marine Acts is to expedite the transfer of surplus government vessels into private hands in order to encourage the development and growth of national commerce, 46 U.S.C. § 861; *Clyde-Mallory Line v. The Eglantine*, 317 U.S. 395, 398–99, 63 S.Ct. 294, 296, 87 L.Ed. 355 (1943). The pertinent provision of the Act of 1920 specifies that the Maritime Administration shall dispose of such surplus vessels "at public or private competitive sale after appraisement and due advertisement." 46 U.S.C. § 864. It is this provision that MarAd allegedly violated by privately negotiating with U.S.C.I.

There is no question that an important objective of these provisions is to protect the government, and ultimately the public, by assuring the integrity of the competitive process by which the government buys and sells property.[10] However, there is significant authority to support the proposition that the interests of those who wish to do business with the government are also protected by such enactments. In *Merriam v. Kunzig, supra,* the Court of Appeals held that the claim of an unsuccessful bidder who wished to furnish leasehold office space to the General Services Administration came within the zone of interests protected by the procurement procedures outlined in the FPAS:

Patently, the statute protects not only the government's interest in securing advantageous contracts, but also the interest of those responding to the government's invitation to do business with it. Merriam, as a bidder, is within the zone of interest protected by the applicable procurement statute.

*Id.* at 1242 (footnote omitted). *See also CCTW&M v. United States Environmental Protection Agency,* 452 F.Supp. 69 (D.N.J. 1978) (claim of bidder within the zone of interests protected by the Federal Water Pollution Control Act).

I conclude that the principles articulated in these decisions control the instant case. Surely if a procurement statute which sets forth bidding procedures for the sale of property to the government is deemed to protect the interests of those who wish to sell the property, an analogous provision which generally defines the manner in which surplus vessels are to be sold arguably protects the interests of those who wish to purchase them. This is not altered by the fact that here, unlike in *Merriam v.*

---

**10.** *See Perkins v. Lukens Steel Co.,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). In *Perkins,* the Supreme Court held that a federal statute, which required government contracts to be made only after public advertising, had been enacted for the protection of the public and not for the protection of private parties wishing to bid on government contracts. Thus, a prospective bidder on a government contract was determined to be without standing to challenge actions by the Labor Department which allegedly violated the public advertising requirement. *Id.* at 129, 60 S.Ct. at 877–78. The present viability of this aspect of *Perkins* is doubtful. In *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970), the District of Columbia Court of Appeals determined that the enactment of the Administrative Procedure Act, specifically 5 U.S.C. § 702, had invalidated the theoretical underpinnings of *Perkins* and therefore held that an unsuccessful bidder for a government contract has standing to vindicate his own, and the public's interest in the legality of the procedure whereby the contract was awarded. This holding has been widely adopted. *See Hayes International Corp. v. McLucas,* 509 F.2d 247 (5th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); *Merriam v. Kunzig, supra;* Annotation, 23 A.L.R.Fed. 301 (1975). *But see Self-Powered Lighting, Ltd. v. United States,* 492 F.Supp. 1267 (S.D.N.Y.1980).

*Kunzig, supra,* the sale of the disputed property occurred pursuant to negotiation and not a bidding process. The interests protected are identical—the integrity of the competitive process for the purchase or sale of property by the government. *See Tenth Street Building Corp. v. General Services Administration,* 387 F.Supp. 727, 729 (W.D. Pa.1975). I therefore hold that plaintiff's claim comes within the zone of interests protected by the statutes in question and that he has standing to maintain this suit.