**AERO CORPORATION, Plaintiff,**

v.

**DEPARTMENT OF THE NAVY, Defendant.**

**Civ. A. No. 79–2944.**

United States District Court, District of Columbia.

Feb. 16, 1983.

Jean-Pierre Sweenen, Roger N. Boyd, Crowell & Moring, Washington, D.C., for plaintiff.

Judith Bartnoff, Asst. U.S. Atty., with Barbara A. McBride, NAVAIR System Command, Office of Gen. Counsel U.S. Dept. of the Navy, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

This is the final chapter of this protracted litigation [1] in which plaintiff has challenged

---

1. Three memoranda filed in earlier phases of this case present a chronological account of relevant events and extensive findings of fact and conclusions of law, all of which are incorporated herein by reference. *See Aero Corp. v. Department of the Navy,* 549 F.Supp. 39 (D.D.C.1982) *("Aero III"); Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 (D.D.C.1982) *("Aero II"); Aero Corp. v. Department of the Navy,* 493 F.Supp. 558 (D.D.C.1980) *("Aero*

the Navy's decision to award contracts for the C–130 aircraft Service Life Extension Program (SLEP) to the Lockheed-Georgia Corporation ("Lockheed" or "LGC") without competition.[2] Plaintiff is an aerospace firm with ten years of experience in performing maintenance on C–130's, as defendant's contractor for Standard Depot Level Maintenance (SDLM) for its C–130 fleet.[3] Plaintiff alleges that the Navy was legally obligated to conduct a competition for its SLEP contracts, and that plaintiff would have submitted adequate bids for SLEP if a competition had been held.[4]

## I.  Overview

Almost six years ago, the Navy formally began planning SLEP for 49 of its C–130's. By mid-1979, defendant had decided to procure SLEP for all 49 planes from Lockheed on a "sole source" basis, that is, without attempting competitive bid solicitation for SLEP service contracts from other firms such as plaintiff or others experienced in the maintenance of C–130 aircraft.[5]

This action was filed on October 30, 1979, after defendant had made its final decision to award the SLEP contracts for all 49 C–130's to Lockheed; contracts for the first 13 planes were actually awarded on November 30, 1979.  On March 4, 1980, after obtaining the advice of the General Accounting Office (GAO), C.R. A–35, considering briefs and documentary evidence and holding a hearing, the Court filed a Memorandum (*Aero I*) finding and concluding that, due to the military urgency of the SLEP induction schedule,[6] defendant's sole-source award of the initial SLEP contracts was not unreasonable.  The Court also concluded, however, that defendant had "not satisfied the GAO or the Court that it now has a reasonable basis for precluding competition for SLEP procurement with respect to the balance of the procurement."  493 F.Supp. at 568.  The Court therefore ordered defendant, *inter alia*, "in good faith to consider the feasibility of competitive procurement for the remaining planes to undergo SLEP, including the use of kits tailored to depot level contractors experienced with the C–130."[7]  *Id.* at 570 (hereinafter "March 1980 Order").

I'' ), cross-appeals dismissed on motion of the parties, No. 80–1545 (June 27, 1980) & No. 80–1480 (June 4, 1980).

The Consolidated Record (C.R.) of the case consists of seven volumes of filings after the decision in *Aero I,* (C.R. 1–144), eight volumes of filings prior to that decision, (C.R. A–1 through A–58), and numerous volumes of separately filed exhibits. The General Accounting Office (GAO) has rendered a number of opinions regarding Aero's protest in response to the Court's requests. *See, e.g.,* C.R. 84 (Sept. 9, 1981); C.R. 63 (June 5, 1981); C.R. A–35 (Dec. 21, 1979) (published at 493 F.Supp. 571–85 as Appendix to *Aero I* ).

2.  As explained in earlier memoranda, SLEP is designed to provide a total overhaul of each C–130 aircraft and to extend the service life of each plane by 10,000 flight hours or approximately 10 years.  Three types of C–130's are included in the Navy's SLEP plan: the C–130F, the KC–130F, and the EC–130 G/Q (TACAMO) and SLEP is also designed to increase the lift capacity of the KC–130F model.

3.  *See* Department of the Navy, *C–130 Service Life Extension Program Monitoring Study Final Report* (hereinafter *Final Report* ), § 9.4.1 (Sept. 1, 1981).  Standard Depot Level Maintenance (SDLM) provides for an extra 3,000 flight hours for each aircraft, *id.* at § 1.5.1, and includes "comprehensive . . . inspection" and

"rework" of the aircraft.  *Id.*  Both SDLM and SLEP require expert knowledge of the C–130 aircraft.  *See* 493 F.Supp. at 561–63.

4.  Plaintiff was found to have standing in *Aero II* on the authority of *Control Data Corp. v. Baldrige,* 655 F.2d 283, 288–89 (D.C.Cir.), *cert. den.,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981).  *See* 540 F.Supp. at 201–03.

5.  The Hayes International firm also "has performed [SDLM] on over 1,300 [Air Force] aircraft," *Final Report, supra* note 3, at § 9.3.3, and is admitted by defendant to possess the technical capability to perform SLEP.

6.  The Navy's C–130 aircraft are vital to the national defense, *see* C.R. A–13, Ex. A, and the condition of the Navy's C–130 fleet is deteriorating.  *See* C.R. 92 at 2–3; C.R. 56, "Documents Related to APRB Decision of May 8, 1981" (separately filed May 11, 1981), Tabs G & H.  The SLEP induction schedule for the 49 C–130's, printed at 540 F.Supp. 218, is therefore "critical."  *Id.* at 186 n. 10; *see* 493 F.Supp. at 565.

7.  "Kits" are packages containing parts, tools, and technical directives that would be provided by the Navy in a competition to enable firms unfamiliar with SLEP to accomplish SLEP in a

Thereafter, while defendant ostensibly studied competitive options, the Court invited further GAO consideration of the possibilities and requirements for competition for SLEP procurement.[8] Meanwhile, plaintiff began to charge that Navy was not complying with the March 1980 Order and was otherwise acting in bad faith. *See, e.g.,* C.R. 2; C.R. 29; C.R. 32. In June and September, 1981, the Acting Comptroller General of the GAO rendered two opinions, concluding that the Navy still had not rationally justified its decision to award the contracts for SLEP service for the remaining 29 C–130's without attempting competition. C.R. 84; C.R. 63 at 2. The GAO advised the Court that the Navy should take specified actions to attempt to compete the remaining SLEP contracts before it decided to award them to Lockheed on a sole-source basis.

Because the GAO's opinion does not bind the parties or the Court, *see Wheelabrator Corporation v. Chafee,* 455 F.2d 1306, 1316–17 (D.C.Cir.1971), the Court invited further briefs, received further evidence and held further hearings on the merits and on the questions raised by plaintiff about the Navy's good faith compliance with the March 1980 Order. These culminated in a Memorandum filed on February 18, 1982,

*(Aero II),* in which the Court concluded that defendant's decision not to permit competition for the remainder of the SLEP procurement still had no rational support in the record, and that plaintiff would probably prevail on its claim that defendant's decision to contract with Lockheed as the sole-source for SLEP for the remaining C–130's without competition violated the Armed Services Procurement Act, 10 U.S.C. § 2304(g) (1976 & Supp. V 1981),[9] and Section Three of the Defense Acquisition Regulations, 32 C.F.R., part 1, vol. 1, ¶ 3–101(d) (1981) ("DAR 3–101(d)").[10] *See* 540 F.Supp. at 184, 211. In order to secure compliance with its March 1980 Order, the GAO's subsequent advice, and the requirements of § 2304(g) and DAR 3–101(d), the Court issued a preliminary injunction. This injunction specified procurement actions to be taken by defendant "to foster competitive conditions for subsequent procurements . . . and possible breakout of components for competitive procurement." DAR 3–101(d). Specifically, the injunction (hereinafter "1982 Order") ordered defendant to "commence forthwith preparation of such an Engineering Change Proposal (ECP) and Air Frame Change (AFC) as may be needed for C–130 SLEP accomplishment by experienced C–130 Standard Depot Level Mainte-

technically satisfactory manner. *See Final Report, supra* note 3, § VIII. Because Lockheed originally designed and manufactured the Navy's C–130 fleet, defendant has been willing to allow it to perform SLEP without kits. Also for this reason, Lockheed would design and manufacture SLEP kits if another firm were selected in a competition to perform SLEP. *See infra* pp. 412–413, for discussion of kit-assisted competition and tailored kits.

8.   The solicitation of GAO advice in government procurement contract challenges was first suggested by Judge Leventhal in *Wheelabrator Corporation v. Chafee,* 455 F.2d 1306, 1316 (D.C.Cir.1971), and was recently endorsed in *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838 (D.C.Cir.1982). The Court of Appeals stated in *Gull Airborne* that, "because of the GAO's competence and experience in procurement activities, district courts should consider, under the doctrine of primary jurisdiction, deferring review of the merits of a challenge to a procurement decision pending GAO ruling." *Id.* at 844 n. 7.

9.   "In all negotiated procurements in excess of $25,000 . . . in which time of delivery will permit, proposals, including price, shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured . . . ."

10.   "Negotiated procurements shall be on a competitive basis to the maximum practical extent. When a proposed procurement appears to be necessarily noncompetitive, the contracting officer is responsible not only for assuring that competitive procurement is not feasible, but also for acting whenever possible to avoid the need for subsequent noncompetitive procurements. This action should include both examination of the reasons for the procurement being noncompetitive and steps to foster competitive conditions for subsequent procurements, particularly as to the availability of complete and accurate data, reasonableness of delivery requirements, and possible breakout of components for competitive procurement."

nance (SDLM) contractors following competitive negotiation limited to LGC and experienced C–130 SDLM contractors," [11] and to "commence to take all other steps necessary to avoid the need for future non-competitive procurement of C–130 SLEP." 540 F.Supp. at 219 (citations omitted). The Court also ordered defendant to file a report on or before May 31, 1982, based on its engineering progress to that date, regarding the possibilities of competition for SLEP contracts for the remaining C–130's. *Id.*

In April 1982, plaintiff filed a pleading which charged that the Navy was not complying with the March 1980 and 1982 Orders. C.R. 128. On May 13, 1982, defendant submitted its "Report to the Court." C.R. 129 (hereinafter "May 1982 Report"). On July 8, 1982, after review of more briefs and documentary evidence, the Court filed a third Memorandum (*Aero III*), ruling that the Navy still had not provided a rational

basis for its sole-source SLEP decisions and reiterating that plaintiff would probably prevail on the merits. 549 F.Supp. at 41, 43–44. In exercise of its equitable discretion, however, the Court declined to enjoin sole-source procurement of SLEP service from Lockheed for the balance of the original 49 planes, in light of the military priorities asserted by the Navy for SLEP and the limited and speculative opportunity for competition that remained at that late date. *Id.* at 45; *see M. Steinthal & Sons v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971).[12] The Court noted at that time that plaintiff's requests for collateral relief and contempt citations were still serious issues in the case.

Defendant has not prosecuted appeals of any of the Court's orders issued over the course of this action, nor has it ever sought clarification or modification of them from the Court. *See* Fed.R.Civ.P. 60(b).

---

11. An Engineering Change proposal (ECP) and an Air Frame Change (AFC) are technical documents prepared for the government by a prospective contractor prior to award of the contract. An ECP describes the work that would be required to be done by a prospective contractor, and also provides firm estimates from that prospective contractor of the estimated cost and time that would be necessary for completion of that work. C.R. 92, ¶ 11; C.R. 94 at 28. The cost and time estimates contained in an ECP provide firm commitments from a contractor upon which a binding contract for the work can be made by the government. C.R. 94 at 36–38. An AFC usually follows an ECP, and constitutes a "detailed statement of work" for the services to be contracted for. C.R. 92, ¶ 12; C.R. 94 at 28. Thus, whereas an ECP explains what is to be done, when, and for how much, an AFC describes *how* certain work is to be done, in whatever detail necessary for potential contractors to understand. According to Defendant an ECP and AFC are vital research and design steps in any competitive procurement. *See, e.g.,* C.R. 92 at 4, ¶¶ 11–12; C.R. 94 at 28–30, 33–34. *Defendant therefore represented to the Court in late 1981 that before it could order competitive kits for SLEP, it had to obtain an ECP and AFC for such kits. See, infra,* notes 31 & 50, for discussion of the Court's 1982 Order specifying an ECP and AFC.

12. *Throughout this litigation the Court has studiously honored the Navy's claim of military necessity and refrained from disrupting the Navy's time schedule for induction of aircraft*

for SLEP. *See Aero III,* 549 F.Supp. at 42, 45. According to this schedule, *reprinted at* 540 F.Supp. 218, 29 of the 49 aircraft scheduled for SLEP have already been inducted, and the final contract was to be awarded by December 1982. *See id.* The final SLEP induction is scheduled to occur within 24 months, by February 1985. Thus, as each month passes, the number of aircraft available for a SLEP competition, and the consequent savings that might be derived from competition, decrease. In effect, the Court concluded in *Aero III* that by the time competitive kits (*see supra,* note 7) would be ready for a competitive SLEP procurement (taking into account time for defendant to appeal as well as the kit procurement process), only a few C–130's if any would have been available for competition. In *Steinthal,* Judge Leventhal noted that, in government procurement actions involving sensitive military procurements and tight delivery schedules, the public interest may sometimes weigh in favor of refusing injunctive relief even where a violation of the law has occurred. 455 F.2d at 1301–03. By July 1982, the SLEP induction schedule represented just such a situation.

The Federal Courts Improvement Act of 1982 in effect ratified this teaching of *Steinthal.* It specifically directs that courts reviewing awards of military procurement contracts "shall give due regard to the interests of national defense and national security." *See* Pub.L. No. 97–164, 96 Stat. 40 (April 2, 1982) (to be codified at 28 U.S.C. § 1491(a)(3)).

Nothing has occurred since July 1982 to alter the Court's previously stated inclination to hold that the course of defendant's conduct of the C–130 SLEP procurement, at least from March 4, 1980, forward, constituted an arbitrary and capricious refusal to fulfill its statutory obligation to pursue competition. Therefore, after consideration of its earlier findings, conclusions, and orders, and upon the entire record, the Court today ratifies those previous findings and conclusions, and holds that defendant has violated its duty under § 2304(g) and DAR 3–101(d) to pursue competition "to the maximum possible extent." An accompanying Order will grant plaintiff's motion for a declaratory judgment on this ground. In addition, to prevent such violations in the specific context of SLEP procurement from occurring in the future, the Order will require special notice of any future SLEP procurement decisions made by defendant.

In addition, the Court finds and concludes that defendant has failed to comply with the Court's March 1980 Order that it consider "in good faith" the feasibility of competitive procurement of SLEP among experienced C–130 contractors, and has evaded the 1982 Order implementing the requirement of a "good faith" effort. This failure and evasion are not the flagrant violations of clear, crisp orders that would sustain the citation for contempt sought by plaintiff. As more fully demonstrated below, however, the Navy's failure to make the "good faith" effort so plainly called for by statute, regulation, GAO advice and Court orders is, by itself, "bad faith." *See McGehee v. C.I.A.,* 697 F.2d 1095 at 1102 n. 26, 1113

(D.C.Cir.1983) (lack of good faith is "evidence of bad faith"). Moreover, its conduct in this litigation since March 4, 1980, if not earlier, plainly evinces bad faith of defendant (but not its counsel)[13] toward plaintiff and the Court. The accompanying Order therefore provides for an award to plaintiff for its attorney's fees from March 4, 1980, until the present in its legally successful but practically frustrated pursuit of relief from its elusive adversary. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).[14]

## II. *Jurisdiction*

Recent legislation requires brief re-examination of the Court's jurisdiction over this matter. Jurisdiction has been and is now founded upon 28 U.S.C. § 1331 and Section 702 of the Administrative Procedure Act, 5 U.S.C. §§ 701–06, as applied to procurement decisions alleged to contravene the statutory obligations of competition. *See Scanwell Laboratories, Inc. v. Schaffer,* 424 F.2d 859 (D.C.Cir.1970) (hereinafter *"Scanwell"); see also Gull Airborne Instruments, supra* n. 8; *Kentron Hawaii v. Warner,* 480 F.2d 1166 (D.C.Cir.1973); *M. Steinthal & Co., supra* p. 408.

While this matter has been in litigation, Congress enacted the Federal Courts Improvement Act of 1982 (FCIA), Pub.L. No. 97–164, 96 Stat. 40 (April 2, 1982) (effective as of October 1, 1982). Section 133 of FCIA grants the Claims Court new equitable jurisdiction "to award injunctive relief in the pre-award stage of the procurement process," while specifically leaving "intact" the *Scanwell* doctrine of federal district court jurisdiction over post-award claims.[15] The

---

**13.** The Court wishes to make clear that it is the Navy and its personnel, and not counsel for the government provided by the United States Attorney in this litigation, that are sanctioned for bad faith conduct here. Government counsel represented a difficult client in an admirable fashion.

**14.** This award does not foreclose an application for fees made "within thirty days of final judgment" under the Equal Access to Justice Act. 28 U.S.C. § 2412(d) (Supp. V 1981). The Court does not today consider an award of fees on this alternate ground. As the prevailing party, however, plaintiff is clearly entitled to its costs

under 28 U.S.C. § 2412(a). *See Hoska v. United States Dept. of Army,* 694 F.2d 270, 272 (D.C.Cir.1982).

**15.** Section 133 of the FCIA amends 28 U.S.C. § 1491 to give the United States Claims Court "exclusive jurisdiction" over procurement claims "brought before the contract is awarded." The Senate Judiciary Committee's report on the Act stated that

By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area.

Claims Court has ruled that, under FCIA, its jurisdiction to provide equitable relief extends only to pre-award contract disputes, and that post-award disputes belong in the district courts. *John C. Grimberg Co., Inc. v. United States,* No. 510–82C (Cl.Ct. Oct. 7, 1982); *see also American District Telegraph v. Dept. of Energy,* 555 F.Supp. 1244 (D.D.C.1983); *Opal Manufacturing Co., Ltd. v. UMC Industries, Inc.,* 553 F.Supp. 131, 133 n. 3 (D.D.C.1982).

■ This case first came to the Court as a pre-award dispute in October 1979, almost three years before the effective date of FCIA. SLEP contracts have been awarded to Lockheed from time to time since November of that year. The final contract was scheduled to be awarded by December 1982. *See* 540 F.Supp. at 218 (chart). Moreover, the actual and final sole-source SLEP decision was first made by defendants in 1979 and was reaffirmed in May 1982. *See* C.R. A–13 at 23–24 and Exs. AO & AT; C.R. 129 & 130. In July 1982, the Court declined to enjoin any part of the 49-plane SLEP procurement. 549 F.Supp. at 45. The Act did not become effective until October 1, 1982, and at least as to the SLEP contracts awarded to Lockheed by that date, this is clearly a post-award case and jurisdiction is firmly in this Court. Plaintiff's current claims for collateral relief all grew out of these now post-award disputes with the Navy. Accordingly, as the plain language of the Act indicates, jurisdiction over such post-award claims lies with this Court. *See John C. Grimberg Co., supra.*[16]

■ With regard to plaintiff's claims for collateral relief, defendant appears to suggest that because this Court refused injunctive relief in connection with the 49 C–130's scheduled for SLEP in *Aero III,* at least

some of these claims should be considered moot. Such is not the case, however. Plaintiff's claims survive refusal of the injunction and are not mooted simply because the litigation has outlasted the Navy's procurement timetable. First, the declaratory judgment that plaintiff seeks will serve both the "public interest in having agencies follow the regulations which control government contracting" and the interest "in preventing the granting of contracts through arbitrary or capricious action." *Scanwell, supra,* 424 F.2d at 864. A declaration of legal rights in this case should deter future violations of the procurement laws as well as relieve both private contractors and the government of uncertainties attendant in this area of the law. These interests survive the awarding of the contracts. *Cf. Simpson Electric Co. v. Seamans,* 317 F.Supp. 684, 688 (D.D.C.1970) (declaring rights of the parties in *Scanwell*-type action although refusing injunctive relief).

Second, plaintiff has raised substantial issues of civil contempt and bad faith on defendant's part with regard to its conduct in these proceedings. Resolution of such collateral issues are "part of the main cause" of action, *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 445, 31 S.Ct. 492, 499, 55 L.Ed. 797 (1911), and are not mooted by the fortuitous timing of defendant's actions. Plaintiff's position clearly provides the adversity necessary to sustain this controversy.

Finally, relief in the form of a notice injunction is necessary to prevent recurrence of the same injury to plaintiff's interests as has occurred with regard to SLEP contracts for the first 49 C–130's. Plaintiff seeks an order implementing this Court's suggestion in *Aero III* that defendant should be required to notify plaintiff of any

---

Specifically, the *Scanwell* doctrine as enunciated by the D.C. Circuit Court of Appeals is left intact.
S.Rep.No. 97–275, 97th Cong., 1st Sess., 23, *reprinted in* 1982 U.S.Code Cong. & Ad.News 11, 33.

**16.** It is not necessary to consider whether this Court or the Claims Court has jurisdiction over

claims founded on any SLEP service contracts that the Navy may not have formally awarded as of October 1, 1982. *See Indian Wells Valley Metal Trades Council, et al., v. United States,* 553 F.Supp. 397 (Cl.Ct.1982). Plaintiff is free to pursue any remaining pre-award contract claims in the Claims Court, and this Court does not consider such claims today.

future decisions made by the Navy for SLEP procurement.[17] C.R. 135, ¶ 6; *see Aero III,* 549 F.Supp. at 47. This relief would be based on the Court's prior finding that defendant obstructed GAO and judicial review in 1979 by obscuring its decision to procure SLEP from Lockheed, *Aero I,* 493 F.Supp. at 568, and would also flow from the Court's declaration today that defendant has violated the law and ·this Court's orders regarding competition. Any further SLEP procurement is likely to be time-dependent due to its relevance to the national security. If a new SLEP procurement decision were now made by defendant, plaintiff could again be denied the opportunity to compete for SLEP and yet also be denied relief by the passage of time and defendant's exploitation of it. This aspect of the SLEP litigation is therefore similar to the "capable of repetition, yet evading review" cases in which termination of a discrete injury does not necessarily generate mootness. *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *see Reeves Inc. v. Stake,* 447 U.S. 429, 434 n. 5, 100 S.Ct. 2271, 2275 n. 5, 65 L.Ed.2d 244 (1980). These considerations with regard to the relief still sought by plaintiff reinforce earlier determinations that there is jurisdiction here. *See* 540 F.Supp. at 200–203; 493 F.Supp. at 566–67.

### III. *Declaratory Judgment*

■ Plaintiff's fundamental contention on the merits is that defendant has violated § 2304(g) of the Armed Services Procurement Act, enacted in 1962, and Defense Acquisition Regulation 3–101(d). *See supra,* notes 9 & 10. Section 2304(g) requires defendant to solicit proposals "from the maximum number of qualified sources consistent with the nature and requirements of the . . . services to be procured." 10 U.S.C. § 2304(g) (Supp. V 1981). "Negotiated procurements shall be on a competitive basis to the maximum practical extent," according to DAR 3–101(d), a regulation enacted in furtherance of the duty imposed by § 2304(g).[18] As stated earlier and often by the Court and the GAO, these directives require that, for procurements extending over time, federal procuring agencies such as defendant must pursue competition until and unless there is some rational, nonarbitrary reason for not doing so.[19] *See Kentron Hawaii, supra,* 480 F.2d at 1169; *Steinthal, supra,* 455 F.2d at 1301. As the Supreme Court noted soon after § 2304(g) was enacted, "competitive bidding is the rule, not the exception." *Paul v. United States,* 371 U.S. 245, 257, 83 S.Ct. 426, 434, 9 L.Ed.2d 292 (1963). And if competition is not feasible for the initial part of a long-term procurement, DAR 3–101(d) obligates defendant to persist in seeking out ways to compete the balance. Matters of technical expertise and certain evaluative judgments may lie within defendant's discretion, and the duty to pursue competition is not absolute.[20] Under the statutory regime, how-

---

**17.** In September 1981, defendant revealed that at least eight more C–130's are tentatively scheduled to undergo SLEP, sometime after 1985. C.R. 92, ¶ 9; C.R. 94 at 108. Defendant still maintains that funding for these planes is uncertain and that no final decision regarding SLEP has been made. C.R. 139 at 9–10.

**18.** It is long-settled that the Defense Acquisition Regulations, including ¶ 3–101(d), have been issued pursuant to statutory authority and carry the force of law. *Paul v. United States,* 371 U.S. 245, 255, 83 S.Ct. 426, 433, 9 L.Ed.2d 292 (1963); *AMCO Electric v. United States,* 493 F.2d 647, 650 (Ct.Cl.1974); *G.L. Christian and Assoc. v. United States,* 160 Ct.Cl. 58, 320 F.2d 345, 347–350, *cert. den.,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963).

**19.** *See Matter of Aero Corp.,* B–194445.3, at 16 (Comp.Gen. Dec. 21, 1979) (C.R. A–35) (appen-dix to· *Aero I,* 493 F.Supp. at 570); *Aero III,* 549 F.Supp. at 46 (discussion of duty to pursue competition); *Aero II,* 540 F.Supp. at 203–211 (same); *Aero I,* 493 F.Supp. at 567–69 (same).

**20.** DAR 3–101(d) mandates competition only to "the maximum practical extent," and § 2304(g) describes a balance between the pursuit of competition and factors such as delivery timetables, bidder qualifications, and "the nature and requirements of the supplies or services to be procured." Because of the technical nature of some of these balancing judgments, advice from the GAO, the independent spokesman and investigator the legislative branch, takes on further importance. *See, supra* note 4. The GAO's findings and conclusions ought not to be disputed unless they are arbitrary and capricious. *Steinthal, supra,* 455 F.2d at 1305. There is no need to apply that standard here;

ever, the obligation to consider and pursue competition in good faith is mandatory and cannot be avoided as a matter of discretion.

### A. Kit-Assisted Competition and Aero I

Defendant has consistently conceded that an experienced C–130 maintenance firm like plaintiff could adequately perform SLEP if provided with "kits" of tools, data, and instructions. See supra, note 7. The GAO has found that defendant's insistence on requiring "some form of kit" for any other contractor to perform SLEP besides Lockheed is not unreasonable, and the Court has adopted this finding. Aero I, 493 F.Supp. at 567. Defendant now attempts to characterize the Court's holding in Aero I as a finding that the Navy's initial noncompetitive contract award for SLEP of 20 planes was "rational and supported by substantial evidence" on the merits. C.R. 139 at 1–2; see also C.R. 133 at 3. This is true only insofar as the "time frame which [was] immediately imminent" in late 1979 supported defendant's decision to award sole-source contracts for SLEP of the first 20 C–130's. Aero I, 493 F.Supp. at 568. Defendant represented in October 1979 that the national security demanded award of

the initial SLEP contracts within a month or two; by any estimate, kits for SLEP competition could not be prepared in time to meet that schedule. Thus, only the timing of the initial SLEP procurement was approved in Aero I. Defendant had not otherwise demonstrated that kits could not be prepared in time to compete "the balance of the procurement." Id.[21]

Defendant's noncompetitive SLEP procurement decision in September 1979, however, encompassed all 49 C–130's and not just the initial 20. Defendant asserted that the length of time required to prepare competitive kits usable by the entire aerospace industry precluded competition for any of the remaining planes. Both the Court and the GAO, however, raised the question of whether kit production time (which was the only factor allegedly precluding competition) could be reduced if the kits were "tailored" for a competition among a smaller number of firms like plaintiff that had a great deal of experience specific to maintenance of the C–130 aircraft.[22] The Court concluded in Aero I that the language of § 2304(g) and DAR 3–101(d) clearly required defendant to pursue competition, even if the only competition possible would

significantly, the GAO and the Court have had no material differences regarding defendant's failure to justify its noncompetitive SLEP procurement decisions.

**21.** The Court in Aero I specifically did not find supported, rational or nonarbitrary the 60-month estimate for kit production relied upon by defendant in September 1979 in its decision not to compete SLEP for any of the C–130's. Defendant now states that "kit development and delivery would entail between thirty-five (35) and fifty-six (56) months." C.R. 133 at 10. This casts some doubt on the validity of a 60-month estimate in 1979, especially when that estimate was proffered by Lockheed so close on the heels of a recommendation by defendant's Procurement Review Board that a part of the SLEP procurement should be competed if kits could be ready in 42 months. See 493 F.Supp. at 563–64, ¶¶ 25–31. Defendant had an estimate of 46 months from Lockheed in late 1978, belying any claim that the 60-month estimate was the only information it had to rely upon in 1979. Cf. C.R. 133 at 18. Defendant's duty to pursue competition required it in 1979 to evaluate all the relevant information it had at that time, with an independent and critical eye, see infra pp. 425–426, and not merely

rely on the single estimate that would support its decision not to compete.

The Court made no finding as to the rationality of or support for the 60-month estimate in Aero I because it found that the "Navy's planning for a kit modification program contemplated a kit usable by any qualified depot level contractor, and did not focus on use by contractors with substantial experience with the C–130." 493 F.Supp. at 565, § 40. See infra note 20. The Court therefore ordered defendant to consider competitive kits designed for such experienced contractors, without ruling upon the controversy surrounding the validity of the 60-month estimate.

**22.** See Aero I, 493 F.Supp. at 568; id. at 583 (GAO). The Court found in Aero I that

[t]he Navy's planning for a kit modification program contemplated a kit usable by any qualified depot level contractor, and did not focus on use by contractors with substantial experience with the C–130 by virtue of SDLM or similar service.

493 F.Supp. at 565, ¶ 40; see infra notes 23 & 24.

be limited necessarily to a small number of highly qualified firms for whom kits might be prepared in less than the 60 months estimated for the preparation of kits usable by *any* potential competitor, experienced or inexperienced.[23] Because defendant had not considered kits for such a limited competition, the Court ordered it in March 1980 to consider "in good faith" the feasibility of competition using kits "tailored" to the limited number of experienced C–130 maintenance firms. *Aero I,* 493 F.Supp. at 570.[24]

### B. *The Monitoring Team*

The March 1980 Order was entered in general rather than specific terms in part in reliance on the Navy's representation that it would set up a Monitoring Team to review Lockheed's performance of SLEP on the first few C–130's and report to the Court regarding the possibility of future SLEP competition. In its decision in December 1979, the GAO had recommended that the Navy "should closely monitor Lockheed's initial performance and evaluate the methods used" and "review the sole source determination before ... awarding a follow-on contract for all or part of the 29 remaining aircraft to Lockheed." C.R. A–35 at 18; 493 F.Supp. at 584. In an affidavit submitted on February 11, 1980, Captain Neil P. Ferraro, NAVAIR's Assistant Commander for Contracts, stated that the Navy "plans to abide by the recommendations of GAO" and would set up a monitoring team. C.R. A–48, ¶ 4. Plaintiff continued to press for injunctive relief regarding the procurement of SLEP for the remaining 29 C–130's, *see* C.R. 9 (July 28, 1980), and critical time was passing. After *Aero I,* however, the GAO and the Court refrained from acting further until the Monitoring Team could substantially complete its review and the Navy could have the benefit of its presumably good faith effort to pursue competition.[25]

**23.** The Court wrote that

"if providing kits specially tailored to such a limited group of maintenance contractors is a feasible way of seeking competition, the Navy has a legal duty to provide such 'tailored kits'.... If the nature of the services in SLEP is such that providing limited kits is the only means of obtaining any competition at all, the Navy must do so, if it can be done practically."

493 F.Supp. at 568.

In its initial opinion on Aero's protest, issued on December 21, 1979, the GAO had written that it was "aware of no legal requirement for the Navy to provide kits specially tailored to a limited group of maintenance contractors, ...." C.R. A–35 at 16 (*Aero Corporation,* 59 Comp.Gen. 146, 79–2 CPD 430 (1979)). The GAO also stated in that opinion, however, that "[t]he Navy is required to seek competition where it can find it." *Id.* Subsequently, in an opinion letter to the Court dated June 5, 1981, the GAO relied upon the concept of "tailored kits," C.R. 63 at 3, and in a follow-up letter dated September 9, 1981, the GAO stated that "[u]se of tailored kits reflecting only the minimum necessary technical detail is the lynchpin of our conclusion" that defendant's requirement of kits for a SLEP competition was proper. C.R. 84 at 5.

**24.** After finding in *Aero I* that the Navy had not focused on tailored kits for use in a limited SLEP competition, *see supra* note 22, the Court stated as an interlocutory finding of fact that the Navy determined that preparation of kits tailored to experienced C–130 contractors would not materially reduce the time required to prepare kits for competitive procurement.

493 F.Supp. at 565, ¶ 40. Thereafter, however, in a hearing in September 1981, the Commander of the Naval Air Command ("NAVAIR"), who was ultimately in charge of the SLEP procurement, testified that the Navy had not considered a limited competition. *See infra* note 30. In 1982, defendant characterized its representation that the design of tailored kits would not materially reduce the time required for kit preparation as an "assumption." C.R. 136 at 7. Upon "testing" that assumption, defendant discovered that such kits might have been prepared in five months less time than industry-wide kits. *Id.; see* C.R. 129 at 9. The last part of finding of fact # 40 in *Aero I* was therefore based on less than the full record now before the Court.

Language requiring good faith on defendant's part was included in the March 1980 Order in light of the finding that, by opposing plaintiff's protests lodged with the GAO in the summer of 1979 as "premature," defendant had "breached its statutory duty to facilitate GAO and judicial review." 493 F.Supp. at 568.

**25.** The litigation was far from inactive, however. In the Spring and Summer of 1980, the "shop-to-ship" parts controversy occupied the Court's attention. *See infra* p. 422. Proceedings before the GAO also proceeded apace into 1981. *See* C.R. 41–63.

As outlined in *Aero II*, 540 F.Supp. at 210, three on-site members of defendant's Monitoring Team made a preliminary determination that competition limited to experienced C–130 contractors was feasible.[26] Consequently, these members proposed to their superiors at NAVAIR that they be given the supplies and personnel to prepare a competitive plan for the remainder of the SLEP procurement. In responding to the on-site members' request, however, the Navy refused the time and support requested. The Navy thus effectively aborted the mission of its on-site members and subsequently produced a Final Report that reiterated the Navy's previous commitment to a sole-source procurement of SLEP from Lockheed, without mention of the opposed interim views of the on-site review team.

Upon discovering the on-site team's conclusions and its treatment by defendant, plaintiff again requested affirmative injunctive relief and alleged that defendant was acting in bad faith and in contempt of the March 1980 Order. C.R. 32 (Jan. 15, 1981). After a series of pleadings and hearings, however, the Court decided in late February 1981 to hold plaintiff's motions in abeyance and request the GAO's advice on specific issues framed in a stipulation between the parties. *See* C.R. 40 & 41; *Aero II*, 540 F.Supp. at 187–88.

### C. *The GAO Opinions*

On July 5, 1981, after elaborate submissions by the parties, the Acting Comptroller General issued his opinion on the merits of plaintiff's protest of the SLEP contract award for the remaining 29 C–130's. This opinion was affirmed upon reconsideration on September 9, 1981. *See* C.R. 84 & 63. In exercise of its "special competence and experience," *Wheelabrator, supra,* 455 F.2d at 1316, the GAO concluded: that defendant's estimate of the time required to prepare kits was excessive by as much as four years (C.R. 63 at 8); that defendant was still not considering the possibility of a limited SLEP competition using tailored kits (C.R. 84 at 4–5); that "the Navy had not justified placing additional noncompetitive SLEP installation orders with Lockheed" (*id.* at 1); that consequently defendant's noncompetitive decision was "premature" (C.R. 63 at 8); and that there was "no impediment" to defendant's beginning a competitive process for SLEP "within the next few months." (C.R. 84 at 11).

### D. *The 1981 ECP*

Ostensibly in response to the GAO's 1981 findings and advice, *see* C.R. 76 at 22, defendant volunteered in August 1981 to order an ECP for kits usable in a SLEP competition (hereinafter "1981 ECP").[27] *See* C.R. 80. Defendant's stipulation stated specifically that the Navy would order an ECP for "military specifications kits." The Court enforced this stipulation by an Order dated August 13, 1981, C.R. 81, and the ECP was contracted for by defendant on August 31, 1981.

### E. *The Preliminary Injunction*

In September 1981, the Court held a number of hearings to implement the GAO's opinions, focusing on plaintiff's motion for a preliminary injunction, C.R. 64 (June 15, 1981). One hearing included several hours of testimony by the Commander of the Naval Air Command (NAVAIR), Vice-Admiral Ernest R. Seymour, the naval official ultimately responsible for the SLEP procurement. *See* C.R. 94 (transcript, Sept. 25, 1981); *Aero II*, 540 F.Supp. at 190–93. At

---

**26.** The Monitoring Team episode is discussed in greater detail *infra* at pp. 420–422.

**27.** In its opinion of June 5, 1981, the GAO had advised the Court that "the Navy says that kits are *always 'tailored'* to the skill and experience level of the type of contractor . . . ." C.R. 63 at 3. The GAO had therefore approved the Navy's position that kits were required for SLEP competition because, "as we understand

what the Navy would do, it would prepare [kits] which would vary in detail from task-to-task." Thus the GAO recommended in its June 5, 1981, opinion that the Navy utilize for SLEP competition the very sort of tailored kits that the Court had ordered defendant to consider in the March 1980 Order. This advice was confirmed by the GAO upon reconsideration of its June 5, 1981, opinion. C.R. 84 at 5.

those hearings it became apparent that, contrary to its normal practice,[28] defendant did not intend to follow the GAO's advice and implement SLEP competition. C.R. 87 at 4, 12, 13; C.R. 94 at 25–26. Admiral Seymour also made it clear that the order placed a month earlier for the 1981 ECP for "military specification" (or "mil spec") kits was actually for industry-wide kits and not for kits tailored to experienced C–130 SDLM maintenance firms.[29] Admiral Seymour also testified that defendant still had not considered the possibility of a limited SLEP competition using tailored kits, despite the Court's March 1980 Order that it do so. C.R. 94 at 74; *Aero II,* 540 F.Supp. at 192–93, ¶ 14.[30]

Based on these evidentiary hearings, the opinions of the GAO, and numerous supplemental pleadings from the parties, the Court entered a preliminary injunction against defendant on February 18, 1982. *Aero II,* 540 F.Supp. 180. Because the Navy had insisted that preparation of an ECP and an AFC were requisite to the conduct of any kit-assisted competition, *see supra* note 11, the preliminary injunction mandated that "defendant commence forthwith preparation of such an [ECP] and [AFC] as may be needed for C–130 SLEP accomplishment by experienced C–130 [SDLM] contractors following competitive negotiation limited to LGC and experienced C–130 SDLM contractors." *Id.* at 219 (citations omitted).[31] Plaintiff did not appeal from the preliminary injunction.[32]

**28.** At a hearing held on June 23, 1981, following the GAO's decision of June 5, 1981, defendant had represented that it was the Navy's general policy not to oppose GAO decisions that were adverse to a position or decision taken by the Navy. C.R. 67 at 7, 12. On September 11, 1981, at the first hearing after the GAO's decision of September 9, 1981, a representative from the GAO represented that when a protest is sustained by the GAO, "there is usually consent by the agency. . . . They normally comply." C.R. 85 at 28. Defendant's representatives at that hearing did not contest that representation.

**29.** As used by the Navy at that time, the term "military specification kits" created the impression the Navy would order an ECP for the type of kits that could be used in a limited competition, i.e. "tailored kits" as that term had been employed by *all* the parties and the GAO up to that point. *See supra* note 27. This confusion over the meaning and significance of "mil specs" was generated by defendant and is discussed *infra* at pp. 426–427.

**30.** At the hearing on September 25, 1981, the Court asked Admiral Seymour:

"Have you ever gone through the exercise of lining up pros and cons, practical, legal, of a competition limited to C–130 SDLM contractors, say, in the United States before this moment?"

C.R. 94 at 74. After some initial hesitation, Admiral Seymour answered: "No. I would have to say no to that." *Id.*

Admiral Seymour further testified on September 25, 1981, that "[i]n my opinion, I didn't need the ECP in the first place, except to convince the people that were arguing with me that I was making a sensible decision." Upon learning that defendant had not ordered or considered kits designed for experienced C–130

maintenance firms, and that Admiral Seymour did not seriously intend the new ECP to facilitate limited competition, the Court vacated the paragraph of its August 13, 1981, Order that had ratified defendant's stipulation about the 1981 ECP, C.R. 95 at 3. *See Aero II,* 540 F.Supp. at 189 n. 16.

**31.** In its opinion letter of June 5, 1981, the GAO had advised the Court that it believed that defendant could either forego or perform simultaneously certain procurement steps such as the procurement of an ECP, a preliminary AFC, or a final AFC, or in the production of kits for competitive SLEP procurement. C.R. 64 at 6–8. Thus in the preliminary injunction the Court ordered defendant to prepare "such" an ECP and AFC "as may be needed" for limited SLEP procurement, 540 F.Supp. at 219, and the accompanying Memorandum noted that the injunction "possibly includ[ed] (at defendant's discretion) development of a new ECP." *Id.* at 216. This was an effort to strike a balance between deferring to defendant's technical expertise and yet accommodating the GAO's recommendations and special experience. Defendant had the option of going through the process it believed was required, or of following the GAO's advice and attempting to speed the procurement process. The language of the preliminary injunction, however, did not provide for the option of no new engineering whatsoever. *See infra* note 50.

**32.** This injunction had been presaged as early as September 11, 1981, when the Court orally granted a preliminary injunction effective only upon promulgation of findings of fact and conclusions of law, C.R. 85 at 22, and stated that "[t]he conclusions will probably be that . . . what the GAO says is correct, and that a competition using tailored kits . . . will proceed." *Id.* at 25.

F. *Navy's May 1982 Report and Aero III*

Several weeks after the preliminary injunction was entered, plaintiff called to the Court's attention the fact that defendant had not ordered a new ECP, or undertaken any new engineering designed to result in limited SLEP competition. C.R. 124 at 2. After a hearing, the Court ordered defendant to file its report required under the preliminary injunction by May 13, 1982, C.R. 127, and plaintiff again moved for a contempt proceeding against defendant. C.R. 128. Defendant never ordered an ECP or AFC for SLEP competition limited to experienced C–130 maintenance firms. Instead, on May 13, 1982, defendant filed an unsigned and undated report that described a "reevaluation" of the industry-wide ECP ordered in 1981. C.R. 129. This report purported to provide conclusive rational support for the proposition that limited SLEP competition was and always had been impossible. *See id.* at 10, 18.

In a memorandum filed on July 8, 1982, the Court found that defendant's May 1982 Report did not supply the previously lacking rational basis for defendant's decision not to compete any part of the SLEP procurement. *Aero III* 549 F.Supp. at 41. First, all of the critical data and conclusions contained in the report apparently came from Lockheed (whose business interest in a noncompetitive SLEP decision is clear), and not from defendant. *See id.* at 43.[33] In addition, "[d]efendant's Report pointedly omit[ted] any systematic attempt to estimate the savings that might be achieved for [the Navy] through the pressures of competition." *Id.*

Finally, even if the data and conclusions in the May 1982 Report had been defendant's own, they were not rationally supported by the record and could not justify defendant's failure to pursue competition. In the May 1982 Report, defendant argued that, by "reevaluating" the 1981 ECP, de-

signed to study the production of industry-wide kits for an industry-wide competition, it could fairly determine that a limited competition using tailored kits was impossible, essentially because production of those kits would take too long. *See* C.R. 129 at 3, 9–10.[34] Putting aside the fact that this was the section of the report that relied most heavily and uncritically on data from Lockheed, this determination was inconsistent with representations that defendant made in the fall of 1981 to the effect that the 1981 ECP that focused on industry-wide competition was not usable for or translatable into an ECP designed for limited competition. In 1981, when the Court ordered defendant to show cause why the Court should not order defendant to modify its 1981 ECP order to encompass tailored kits for limited competition, C.R. 95 at 3, defendant submitted an affidavit from Admiral Seymour and a letter from Lockheed, both of which stated that to change from preparing an industry-wide ECP to preparing a limited ECP involved "significant changes," C.R. 98, ¶ 3 & Ex. 2, ¶ 4, and would require "detailed surveys of experienced C–130 SDLM contractors" over "a period of months." C.R. 98, ¶ 7. Yet, in the May 1982 Report, defendant argued that a new ECP designed to study tailored kits for limited competition would be "duplicative" of the 1981 industry-wide ECP. C.R. 129 at 5.

Obviously, if the two types of ECPs were in fact interchangeable, then defendant misrepresented the facts to the Court in 1981 and effectively delayed the litigation for over half a year, thereby further frustrating the possibility of competing a portion of the SLEP procurement. If the two types of ECPs would be significantly different, however, then defendant's May 1982 Report to the Court was not responsive to the preliminary injunction. In either case, defendant's contradictions expose the

---

**33.** Necessarily implicit in the statutory duty to compete is an obligation for a procuring agency to avoid over-involvement with any single competitor for a given procurement. *See infra* p. 426.

**34.** Defendant has renewed this argument in its current pleadings, *see, e.g.,* C.R. 133 at 15–17, despite this Court's rejection of the argument and the May 1982 Report in *Aero III*.

Navy's failure to meet its obligation under *Scanwell* to present to the Court a rational basis for its decision to award the SLEP contracts on a sole-source basis.

■ No evidence relevant to the merits has been introduced to the record since July 1982, although the parties have submitted additional pleadings and the Court heard long argument from them on August 13, 1982.[35] In *Aero III,* the Court found "a substantial likelihood that it will conclude that defendant has violated the procurement law and proceeded with an irrational procurement policy that has seriously injured the public interest ... and has also substantially injured the business interests of Aero Corporation." 549 F.Supp. at 44; *accord,* 540 F.Supp. at 211. Defendant's latest arguments are familiar and unconvincing, and the likelihood that plaintiff would prevail on the merits has now ripened into certainty. In the accompanying order, the Court finally adjudges and declares that defendant's conduct of the SLEP procurement, at least from the date of the March 4, 1980, Order, constitutes a "clear and prejudicial" violation of 10 U.S.C. § 2304(g) and DAR 3–101(d). *Kentron Hawaii, supra,* 480 F.2d at 1169.

## IV. *Injunctive Relief*

■ In July 1982, the Court refused to enjoin the award of sole-source contracts for SLEP of any of the original 49 C–130's scheduled for SLEP, because only 32 months remained until the last scheduled SLEP induction. At that time the Court ordered defendant to show cause why the Court should not issue a "notice injunction," i.e. an injunction requiring the Navy to notify plaintiff or the public of its earliest firm intention to seek SLEP service for

C–130's in the future. 549 F.Supp. at 47.[36] Such an order is now justified and required by the Navy's unwarranted frustration of GAO and judicial review of its SLEP decision in 1979, *see* 493 F.Supp. at 568–69, and its continuing use since then of claims of time pressure to justify its resistance to the requirements of the law, the advice of GAO, and orders of this Court to explore opportunities for a limited SLEP competition among experienced C–130 contractors such as the plaintiff. Defendant's argument that to provide notice only to plaintiff "would provide Aero with an unfair and impermissible advantage over other aircraft maintenance contractors," C.R. 136 at 2, is well-taken. This relief is for the benefit of the public's interest in competition as well as the benefit of plaintiff. Thus, the accompanying Order requires defendants to provide public notice of any decisions that its APRB makes concerning future procurements of SLEP, by promptly publishing the substance of such decisions in the *Commerce Business Daily,* "Synopsis of U.S. Government Proposed Procurement Sales and Contract Awards." *Cf.* DAR ¶ 1–1003.-1(a), 32 C.F.R., parts 1–39, v. I, at 209 (1981) (requiring proposed procurements to be "publicized promptly in the *Commerce Business Daily*").

## V. *Contempt*

■ Since January 1981, the Court has had before it plaintiff's motion that defendant show cause why it should not be held in contempt. C.R. 32. That motion charged defendant with bad faith and noncompliance with court orders and requested as relief *inter alia,* an award of attorneys' fees and costs. Plaintiff's motion has been renewed and supplemented. *See* C.R. 121,

---

**35.** Defendant moved for summary judgment on July 19, 1982. C.R. 133. Plaintiff moved for "final relief" on July 26, 1982, C.R. 135, and plaintiff's opposition to defendant's summary judgment motion was waived by the Court. C.R. 138. Both parties have agreed to submit on the record as it stood on August 13, 1982, the date of final argument. The only new factual matter submitted since the decision in *Aero III* is an affidavit from plaintiff's controller relating to plaintiff's claimed eligibility to

receive an attorney's fees award under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (Supp. V 1981).

**36.** *See supra* note 17. In its May 1982 Report defendant referred to the eight C–130's tentatively scheduled for SLEP induction after the 49 currently scheduled, and stated that "these aircraft should be considered in any SLEP planning." C.R. 129, Ex. 1, Encl. 4, ¶ 3(b).

128, 135. Defendant has responded in detail to the substance of plaintiff's charges on at least three occasions. *See* C.R. 35, 131, 139.

The Court concludes that citation of the Navy for contempt would be inappropriate on this record. As indicated above, the Court's Orders were designed to stimulate initiative in the Navy for competition, as required by law, yet not supercede its discretion. Court Orders requiring specific actions by specific persons at a specific time, that would have laid a firm predicate for enforcement by contempt proceedings, would have been counterproductive. The necessary generality of the Orders now precludes proof of contempt with the necessary specificity. *Compare United v. Barnett,* 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964); *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *United States v. Shipp,* 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906). Accordingly, the accompanying Order will deny the plaintiff's continuing application for a contempt citation.

## VI. *Attorney's Fees*

In refusing injunctive relief regarding the remainder of the 49 C–130's in *Aero III,* the Court noted that plaintiff's motions seeking attorneys' fees were still a serious issue in the case. *Aero III,* 549 F.Supp. at 45. Defendant has fully responded to factual allegations which bear on both contempt and attorney's fees, and both issues were fully aired at the final hearing before the Court on August 13, 1982. In light of this record, defendant has had ample notice of the attorney fee issues, and of the Court's concern about them, and has had a full opportunity to respond. Thus, were the Court inclined to cite defendant for contempt, it could not be argued that there has been a lack of proper process. The Court's Memorandum in *Aero III* served as a functional "show cause" order concerning plaintiff's contentions, *see* 549 F.Supp. at 45, and in subsequent pleadings and hearings defendant was clearly responding to the substance of those contentions. *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980) ("[A]ttorney's fees should not be assessed lightly or without fair notice and an opportunity for a hearing on the record.")

■ Plaintiff's request for attorney's fees does not depend on a finding of contempt. Under the "American rule," prevailing litigants generally bear their own attorneys' fees and costs, absent some statutory authorization for fees or a common law exception to the rule. One well-established common law exception arises "when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons....' " *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 258–59, 95 S.Ct. 1612, 1616, 1622–1623, 44 L.Ed.2d 141 (1975) (*quoting F.D. Rich Co. v. United States, ex rel. Industrial Lumber Co., Inc.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). *See also Vaughan v. Atkinson,* 369 U.S. 527, 530–31, 82 S.Ct. 997, 999–1000, 8 L.Ed.2d 88 (1962); *Lipsig v. National Student Marketing Corp.,* 663 F.2d 178, 180 (D.C.Cir.1980) (*per curiam*). Under this "bad faith exception," attorney's fees awards are not restricted to instances of frivolous litigation or implausible legal theories; attorney's fees may also be awarded upon a finding of bad faith "in the conduct of the litigation." *Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973); *see Lipsig, supra,* 633 F.2d at 182; Note, *Attorney's Fees and the Federal Bad Faith Exception,* 29 *Hasting L.J.* 319, 327 (1977). Because bad faith awards of attorney's fees are exceptions to the normal rule, however, " '[t]he standards for bad faith are particularly stringent,' and the fee-shifting sanction is invocable only for some dominating reason of justice." *Lipsiq, supra,* 663 F.2d at 180 (footnotes and citations omitted) (*quoting Adams v. Carlson,* 521 F.2d 168, 170 (7th Cir. 1975)); *see also National Assoc. of Letter Carriers v. U.S. Postal Service,* 590 F.2d 1171, 1177–78 (D.C.Cir.1978).

■ Until recently the United States and its agencies have been shielded by the doctrine of sovereign immunity from liability for attorney's fees, even in circumstances in

which private parties would have been held responsible at common law. *NAACP v. Civiletti,* 609 F.2d 514, 516 (D.C.Cir.1979), *cert. den.,* 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1114 (1980); *Cuneo v. Rumsfeld,* 553 F.2d 1360 (D.C.Cir.1977). For this reason courts have declined to assess attorney's fees even when the government had litigated in bad faith. *See Donovan, Secretary of Labor, v. Nichols,* 646 F.2d 190, 192 (5th Cir.1981); *Gibson v. Davis,* 587 F.2d 280, 281–82 (6th Cir.1978), *cert. den.,* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 374 (1979); *Rhode Island Committee on Energy v. General Services,* 561 F.2d 397, 405 (1st Cir. 1977). However, the Equal Access to Justice Act (EAJA), Pub.L. 96–481, 94 Stat. 2327, (codified at 28 U.S.C. § 2412 (Supp. V 1981)), eliminated the absolute sovereign immunity bar to attorney fee awards against the government. The EAJA provides that "[t]he United States shall be liable for such fees and expenses *to the same extent that any other party would be liable under the common law ....*" 28 U.S.C.A. § 2412(b) (emphasis supplied). Thus, if bad faith is now manifested in civil litigation, the plain meaning of the EAJA is that an attorney fees award is not barred or made less likely simply because the offending party is the government. *See Knights of the KKK v. East Baton Rouge,* 679 F.2d 64, 67 (5th Cir.1982); *Donovan v. Dillingham,* 668 F.2d 1196, 1198 & n. 4 (11th Cir.)

*rev'd en banc on other grounds,* 688 F.2d 1367 (11th Cir.1982). The legislative history of the EAJA confirms the plain language indication that Congress intended to make the bad faith attorney's fee exception applicable to the United States and its agencies. *See* H.R.Rep. 96–1418, 96th Cong., 1st Sess. (Sept. 26, 1980) at 9, 17, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4953, 4987, 4996. *See also* 28 U.S.C. § 2412(c)(2) (specifically noting the possibility of fee awards against the United States based on "bad faith").[37]

■ At an early, interlocutory stage of these proceedings, before the entire record had been explored, the Court stated that "the record supports no imputation of bad faith on the part of the Navy."[38] *Aero I,* 493 F.Supp. at 568. This was in the context of the Court's interlocutory finding that the Navy had breached its statutory duty to facilitate GAO and judicial review of its sole-source decision and had "seriously interfered" with the duties of the GAO and the Court. *Id.* at 567–68. Review of the entire record for this final decision on the merits establishes that the confidence expressed by the Court in the Navy's respect for the congressional mandate for competition, GAO advice, and Court orders requiring good faith efforts to effect competition was misplaced.[39] The Memorandum and

---

**37.** Section 208 of Public Law No. 96–481 provided that the provisions of the EAJA would be effective as of October 1, 1981, and would apply to "any civil action ... which is pending on, or commenced on or after, such date." *See* 5 U.S.C. § 504 note (Supp. V 1981). Nothing in the EAJA or its legislative history indicates that awards under the Act were intended to be limited to only those fees and costs incurred after its effective date; indeed, the express inclusion within the terms of the Act of cases "pending" on that date counsels against such a limitation. *See Nunes-Correia v. Haig,* 543 F.Supp. 812, 814–16 (D.D.C.1982).

**38.** As the Court of Claims has suggested in related contexts, "[a]ny analysis of a question of governmental bad faith must begin with the presumption that public officials act 'conscientiously in the discharge of their duties.'" *Haney v. United States,* 676 F.2d 584, 586 (Ct.Cl. 1982) (*quoting Kalvar Corporation, Inc. v. United States,* 543 F.2d 1298, 1301 (Ct.Cl.1976),

*cert. den.,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977)). Because the EAJA now places the government in the same position as "any other party ... under the common law," 28 U.S.C. § 2412(b) (Supp. V 1981), it is questionable whether the government should receive any special consideration in a fee award analysis. Nevertheless, this Court approached this litigation over three years ago with a presumption of the government's good faith and deference to its (and the GAO's) technical expertise.

**39.** Upon review of the entire record, a number of facts relevant to the SLEP procurement prior to the institution of this lawsuit emerge. Without exhaustively relating these pre-litigation facts, the record tends to demonstrate on the part of defendant:

   (1) marked pre-award bias toward Lockheed as the ultimate and sole-source SLEP contractor;

Order of March 1980 gave the Navy clear notice that the Court disapproved of the Navy's frustration of the GAO's and the Court's critical examination of the sole-source decision, that defendant had not yet met its duty under the law to "foster competitive conditions" for the procurement of SLEP service for the remaining 29 C–130's, and that future evasion of the duties imposed by law and the Court's March 1980 Order would be at the Navy's risk. The Navy took no appeal. But it was not responsive to the deference shown to it at these early stages, or to the Court's orders designed to stimulate good faith consideration of a competitive opportunity for plaintiff and other experienced C–130 maintenance contractors. The Navy exploited the deference shown to it by the Court and required plaintiff to continue litigating, presumably at some considerable expense.

Defendant's conduct in this litigation while it was bound by the Order in *Aero I* of March 4, 1980, as more particularly recounted below, constitutes a vexatious and oppressive failure to respond to Court orders and to deal with the Court and the plaintiff in good faith, and justifies an award of plaintiff's attorney's fees for litigation since that date. Such a judgment is not made lightly in this case and is based on "extensive findings of fact." *Lipsiq, supra,* 663 F.2d at 181. The facts demonstrating the Navy's bad faith are, in part, the same as those stated previously in connection with the declaratory judgment. They dem-

onstrate that the Navy failed to consider in good faith competition limited to experienced C–130 contractors using tailored kits, despite statute, regulations, GAO advice and Court orders obtained by plaintiff in the litigation, resulting in plaintiff's requiring legal services and incurring attorney's fee obligations that would not have been required or incurred if the Navy had timely considered competition in good faith. This is "the dominating reason of justice" which requires a "fee-shifting" sanction. *Id.* at 180. The facts demonstrate bad faith *in the litigation,* including failure to follow Court Orders, and not merely a failure to follow the law. The facts are detailed below and supplemented by other specific examples of Navy conduct that give additional support to a fee award:

### A. Factual Findings

(1) *The SLEP Monitoring Team.*[40] In its March 1980 Order, the Court enforced the Navy's commitment made by Captain Neil P. Ferraro to set up a Monitoring Team to monitor Lockheed's initial performance of SLEP.[41] *See supra* pp. 413–414. The Navy commissioned its Monitoring Team later in March 1980. The Monitoring Team consisted of two groups of Navy personnel: an "on-site" team, three to five individuals who remained at Lockheed's plant in Georgia to observe first hand Lockheed's SLEP performance (while making two one-day trips, one to the facility of plaintiff and the other to another experienced SDLM con-

---

(2) uncritical yet heavy reliance on Lockheed for advice when making judgments regarding the possibility of SLEP competition;

(3) failure to obtain independent evaluation of Lockheed's technical data and conclusions, despite the early perception that such independent review was necessary;

(4) apparent *post hoc* adjustment of paperwork and analysis designed to support the decision not to compete any SLEP contracts; and

(5) a lack of urgency or expedition surrounding the SLEP procurement until plaintiff evinced its desire to compete for SLEP contracts and a Navy "whistleblower" alleged that a sole-source SLEP contract award would waste over $22 million.

For a full display of these and other pre-litigation facts, *see* C.R. A–2, especially Exs. 1, 2, 11 & 12; C.R. A–13, especially Exs. E, G, P, T, U,

W & AC; and C.R. A–38, at 25–37 & Exs. 19–53. These pre-litigation facts provide a relevant background for evaluation of defendant's conduct since this action was filed.

**40.** *See* C.R. 32 at 13–28 and Exs. 13–38; C.R. 97, Exs. 18–32 (separately bound as "Attachments to Plaintiff's List of Record References"); *see also Aero II,* 540 F.Supp. at 210–11.

**41.** The Court's March 1980 Order mandated "[t]hat the Navy honor the commitment made for it by Captain Neil P. Ferraro in his affidavit" and "[t]hat the Navy will . . . closely monitor Lockheed's initial performance to determine whether its original assessment of technical risks and the need for kits remains reasonable." 493 F.Supp. at 570.

tractor); and a group of other Navy personnel working from an off-site review office (some of whom may have visited the site from time-to-time). In November 1980, an interim draft of the Monitoring Team report, prepared by the office team, was presented to the on-site team for comment. Three of the four primary on-site team members expressed "deep misgivings" about the report, including its methodology, conclusions, and justifications for supporting continued sole-source procurement of SLEP. *See* C.R. 97, Exs. 18–30 (separately bound as "Attachments to Plaintiff's List of Record References"). These comments consistently expressed the view that "other contractors," i.e. experienced C–130 maintenance contractors, could accomplish SLEP with minimal assistance from Lockheed. The on-site personnel reported that they had "seen no technical data so complicated that [it] would create any [technical] risk .... In fact these first SLEP items are already being performed by all of the other activities installing them as standard parts." *Id.*, Ex. 24. They also reported that "most tooling req[uired] for EC[–130] aircraft is already available at SDLM contractors ...." *Id.*, Ex. 25. One on-site team member finally commented that he "[saw] very little use of our observed data within the summary of findings" contained in the interim report. *Id.*

Admiral Seymour responded directly to the critical on-site team members, acknowledging that "[i]f your position ... is supportable" then "competition is a viable option." He requested the on-site members "to prepare ... a sample package ... for use in a competitive procurement," including "all data, drawings, instructions and procedures [that would be] needed." *Id.*, Ex. 31.[42] But at the same time that he made this request, he effectively precluded

the possibility that it would be meaningful. He directed that this detailed competitive package be prepared by December 8, 1980, no more than eight working days after the members received his letter. On November 24, 1980, the on-site team members responded, predictably, that "in view of the short amount of time" they had been given to prepare a competitive procurement package, they needed "more qualified personnel to properly prepare" it. . *Id.*, Ex. 32. They reiterated their position, however, that "we have adequate data to prepare a sample package" for a limited SLEP competition. *Id.* Their response contained a detailed list of SLEP tasks for the EC-type 130 aircraft that these on-site team members believed "require very little data for accomplishment and/or the parts ... are easy to manufacture." *Id.*, p. 2. They asserted that "there are only four (4) [tasks] that would require significant effort for development into kit form"; they described these tasks and specified the reasons for their conclusions. *Id.;* *see also Aero II,* 540 F.Supp. at 210–11. The record contains no further evidence as to defendant's disposition of the on-site team member's comments and criticisms.

In short, when there was still ample time for competition on the SLEP contracts for at least a substantial portion of the remaining 25 or so planes, qualified personnel of defendant's own choosing observed Lockheed's and plaintiff's facilities first hand and informed the Navy that they believed that a limited SLEP competition was possible and was being unnecessarily foreclosed.[43] Despite these firm recommendations for SLEP competition made by defendant's own aerospace experts, and specific requests for support that would have facilitated preparation of a competitive package, no additional personnel were sent to aid the on-site members in preparing a competitive

---

**42.** Admiral Seymour enclosed with his response the requirements relevant to preparing for "an industry-wide competition." C.R. 97, Ex. 31. Thus a limited competition was not considered, despite the comments of the on-site members apparently supporting that concept.

**43.** Members of the on-site team had been instrumental in designing the SLEP program, and

were intimately familiar with its components and requirements. Four persons (Moskal, Gates, Hightower, and King) evidently were the primary observers. *See* Final Report, *supra* note 3, at 1–6, Table 1–1. Moskal was the team leader; Gates, Hightower, and King were the members who indicated that competition was possible.

bid package. The Final Report, issued on September 1, 1981, in purported fulfillment of defendant's commitment which was the justification for the Court's and GAO's forebearance, contained no reference to the on-site members' criticisms. It concluded, of course, that SLEP competition was not feasible.

Defendant argues that the dissenting team members ultimately signed the Final Report, and that the interim misgivings of a few members of the team prove nothing. C.R. 144. One of the record references that defendant cites to support this argument, however, indicates instead that the dissenters never gave their final approval to the Final Report, although they may have reviewed it. *See* C.R. 36, subsections 7, 8, 9. In *Aero II,* the Court invited defendant to address "the precise disposition of the [on-site team's] recommendations" in future filings. 540 F.Supp. at 211 n. 51. Yet defendant still has not explained why the on-site team was given only a few days to prepare a competitive data package or how and why the dissent and criticisms were ultimately resolved the way they were. *Cf. Board of Educ. v. Pico,* —— U.S. ——, 102 S.Ct. 2799, 2812, 73 L.Ed.2d 435 (1982) ("disregard" of advice and rejection "without explanation" of review committee's recommendations may raise "suspicions regarding . . . motivations"). In fact, defendant has offered no evidence at all on the matter. Defendant's cavalier treatment of the on-site team and its failure to further address the issue is extraordinary in the context of this litigation. In light of this Court's March 1980 Order that defendant consider "in good faith" the possibility of limited SLEP competition, Captain Ferraro's sworn commitment enforced by the Court, and the delay occasioned by the Court's forebearance and reliance on that commitment, Admiral Seymour's unexplained treatment of his on-site team's documented disagreements and recommendations is evidence of bad faith too strong to be ignored, and

demands assessment of attorney's fees. *See West Coast Media, Inc., v. F.C.C.,* 695 F.2d 617 at 619 (D.C.C.1982) ("discrepancy between . . . promise and . . . performance" relevant to good faith inquiry).

(2) *"Shop-to-Ship" Parts.* In its March 1980 Order, the Court directed defendant to "give Aero at least six months written notice of . . . the formation of practically irreversible plans to undertake further [non-competitive] SLEP procurement." *Aero I,* 493 F.Supp. at 570. Yet in May 1980, defendant belatedly informed plaintiff without any prior notice that, in order to meet Navy's SLEP induction schedule, certain SLEP parts were "currently being fabricated into a shop-to-ship configuration." C.R. 1, Ex. 3. These parts were to be used for SLEP of TACAMO C–130's that had not been included among the 20 C–130's whose noncompetitive SLEP procurement the Court had approved in *Aero I.* Yet Navy's letter to plaintiff stated that "[w]hether these parts will be suitable for competition is presently unknown." *Id.* Defendant's entry into an irreversible yet potentially noncompetitive parts procurement, without advance notice, technically violated the March 1980 Order.

In addition, defendant failed to inform the Court of the parts procurement even after it had notified plaintiff; the Court did not learn of this "shop-to-ship" parts order or controversy until at least two weeks after defendant's decision was announced, when plaintiff sought relief from the Court. The Court still had under advisement plaintiff's claim and the GAO's advice that SLEP for the remaining aircraft might be competed. Following so closely on the heels of the decision in *Aero I* which explicitly found the Navy inattentive and mistaken regarding its statutory duty to compete, the failure of defendant to notify the Court of a potentially noncompetitive SLEP decision was also not good faith compliance with the Court's March 1980 Order.[44]

---

44. The failure to notify the Court of a decision obviously having a potentially significant bearing on future SLEP competition is even more disturbing in light of the time constraints

placed by defendant on the SLEP program. Defendant felt free to press the urgency of the induction schedule on the Court when speed served its purposes, *see Aero I,* 493 F.Supp. at

(3) *The August 1980 Order.* To resolve the "shop-to-ship" parts controversy, the Court entered an Order on August 13, 1980, directing defendant to "expressly consider whether the configuration of parts . . . is a factor in determining if competition is possible," and report its conclusion to the Court. C.R. 12, at 4. Defendant did not report to the Court pursuant to this Order until December 16, 1980.[45] C.R. 28. This report announced defendant's conclusion that SLEP for the five remaining TACAMO aircraft could not be competed,[46] yet the report contained *nothing* in response to the Court's Order that defendant "expressly" consider the "shop-to-ship" parts configuration question.[47] At a hearing held December 19, 1980, defendant conceded that its evaluation of TACAMO SLEP competition had not addressed the parts configuration issue, C.R. 29 at 7–8, but maintained that, due to time constraints, that issue was not a "factor in determining if competition [was] possible" for the TACAMO aircraft specifically. *See id.* at 12. Defendant conceded, nevertheless, that this action could possibly handicap SLEP competition for other C–130 aircraft. *See id.* at 5. The August 13, 1980, Order and its context required the Navy to inform the Court whether or not experienced companies such as plaintiff's could use "shop-to-ship" parts in

the event that SLEP competition required it. Defendant disregarded this directive and attempted to construe the Court's Order in a hypertechnical manner. Defendant did not request clarification of the August 1980 Order, however, and it is clear on its face. Defendant's failure to comply is again evidence of bad faith.[48]

(4) *The 1981 ECP.* In August 1981, defendant ordered an ECP for competitive kits, which was ostensibly responsive to the Court's March 1980 Order and the GAO's June 5, 1981, opinion that SLEP competition might be possible if limited to experienced C–130 maintenance firms. *See supra* p. 414. The ECP actually ordered by defendant in August 1981, however, assumed an industry-wide rather than a limited competition, a fact that was obscured by the confusion that defendant created with respect to its definition of "military specification" kits. *See infra* pp. 426–427; *Aero II,* 540 F.Supp. at 189 n. 16; C.R. 84 at 4–5. Both the Court and the GAO, at least since the March 1980 Order, have clearly and continually focused on the technical expertise relating to C–130 aircraft that experienced firms such as plaintiff possess and that the rest of the industry unfamiliar with the C–130 does not possess.[49] Compe-

568–69, yet it apparently felt no such time pressure when deciding not to compete.

**45.** This long delay occurred, according to defendant, because the Navy had to wait for the Review Team's Interim Report concerning Lockheed's initial performance of SLEP. This does not explain why the "shop-to-ship" question could not be answered earlier; all that was required was an evaluation of whether plaintiff and other experienced C–130 maintenance firms could use parts fabricated in Lockheed's configuration. In light of the technical complexity of the SLEP program, the Court has concluded that lengthy delay in completing various studies or reports should not, of itself, be charged to defendant as evidence of bad faith. *Cf. Hutto v. Finney,* 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2572 n. 14, 57 L.Ed.2d 522 (1978) (bad faith may be demonstrated by "delaying or disrupting the litigation"). Keeping in mind, however, the cumulative effect that any delay had on plaintiff's opportunity to compete for SLEP, the other instances of defendant's bad faith chronicled here take on even larger proportions.

**46.** The Court notes that it was originally informed by defendant that only four TACAMO aircraft were at issue. *See* Affidavit of Captain Neil P. Ferraro, C.R. A–48, ¶ 5.

**47.** This omission ultimately gave rise to plaintiff's initial contempt motion, C.R. 32. *See* C.R. 29 at 15–19.

**48.** Subsequently, it became clear that "shop-to-ship" parts could be used by other experienced C–130 contractors besides Lockheed. *See* C.R. 39 at 5; C.R. 76 at 19; C.R. 81. This later conclusion in no way excuses defendant's earlier failure to address the question when ordered to do so by the Court.

**49.** The common sense inference that there must be some relevant difference between aerospace firms that have worked on hundreds of C–130's and those that have never worked on a C–130 is confirmed in defendant's own technical documents. In paragraph 7 of defendant's own evaluation of the 1981 ECP, defendant's technical personnel pointed out two

tition among such expert firms using kits targeted at *their* level of experience was the express focus of the March 1980 Order. 493 F.Supp. at 565, 568, 570. The Navy's decision to order an industry-wide ECP after *Aero I* and the GAO's advice was not a simple mistake or misunderstanding. It represents a deliberate obfuscation and evasion of the terms of the Court's orders and GAO's advice that the Navy consider in good faith a limited competition and tailored kits.[50]

(5) *Contradictory Positions Concerning ECPs.* Furthermore, once the industry-wide 1981 ECP decision was brought to the Court's attention, defendant argued that to alter its focus to an ECP for limited competition would require so much time and effort that SLEP competition would be precluded in any case. *See* C.R. 98, ¶ 9; *Aero II,* 540 F.Supp. at 189 n. 16; C.R. 98, ¶ 9. Yet in May 1982, only eight months later, defendant indicated that a simple analysis of certain SLEP tasks was all that was required to evaluate the possibilities of limited competition. *See* C.R. 129. Thus, as the Court noted in *Aero III,* in September 1981 defendant either misinformed the Court as to what was required to evaluate the possibility of a limited competition, or it "needlessly retarded" the litigation. 549

F.Supp. at 43; *see supra* p. 416. Either conclusion evidences a lack of good faith efforts by defendant to pursue competitive options and bad faith towards plaintiff that resulted in the imposition upon plaintiff of the burden of extended litigation.

(6) *The Response to the Preliminary Injunction.* As noted above, the preliminary injunction directed defendant to "commence forthwith preparation of such an [ECP] and [AFC] as may be needed for C–130 SLEP . . . following competitive negotiation limited to [Lockheed] and experienced C–130 SDLM contractors." *Aero II,* 540 F.Supp. at 219. The Court noted in the Memorandum accompanying the preliminary injunction that this order would "direct defendant to begin engineering design for a kit-assisted competitive negotiation," *id.* at 185. At the conclusion of the Memorandum, the Court again noted that the accompanying Order "directs defendant to undertake engineering design," *id.* at 216, and stated that "defendant can best serve the public interest . . . by rapid development of engineering designs for kits to assist a limited competition." *Id.* at 214. These statements are not ambiguous. They directed defendant to do something, to begin "forthwith" whatever engineering proc-

---

substantial differences: experienced C–130 SDLM contractors like plaintiff would already possess the data required to understand a kit-assisted SLEP, and they would also possess many of the tools required for such a program. C.R. 129, Ex. 2 ¶ 7. Technical data and tools represent, by defendant's own estimation, two of the three vital components of any kit. *Final Report, supra* note 2, § 8.1. Additionally, Admiral Seymour testified in 1981 that C–130 maintenance experience "improves [the] qualifications" of a contractor to perform SLEP. C.R. 94 at 98. Defendant has never rationally or nonarbitrarily explained why it considers these differences to be insignificant.

**50.** The Navy recently has professed not to understand the reference in the 1980 Order to "kits tailored to depot level contractors experienced with the C–130" and variations of those terms. Such terms, however, have been used throughout this litigation by defendant as well as plaintiff and the GAO. *See, e.g.,* C.R. 139 at 9–10; C.R. 131 at 5. This professed misunderstanding is another reflection of the Navy's "grudging" response to GAO advice and Court

orders symptomatic of bad faith. *See McGehee v. C.I.A.,* 697 F.2d 1095 at 1114 (D.C.Cir. 1983). The parts, tools and instructions that comprise "kits" to be used by a contractor with no experience with C–130 maintenance might require more time and expense to prepare than would kits required by an experienced C–130 contractor; indeed, defendant concedes that this is so with regard to a tailored kit AFC. C.R. 129 at 4. If time and expense could be saved by using kits prepared to serve the particular requirements of experienced C–130 contractors, competition between them might be possible. Again, this has been the focus of the GAO's and the Court's inquiry since March 1980 (*Aero I*). The Navy had a duty to make a good faith effort to pursue this concept or demonstrate a rational basis for not doing so. It never did. The Navy's subsequent profession of misunderstanding or inability to understand this and its failure to make the good faith effort are factors considered in the decision to award attorney's fees for lack of good faith.

ess was required to conduct a limited competition.[51] Defendant did not follow this Order. It did not order or conduct any new engineering design; instead, three months later, after plaintiff reported the noncompliance to the Court, the Navy merely submitted a report positing that no new engineering was required to determine that limited SLEP competition was impossible. C.R. 129; *see supra* p. 416. This final action by defendant did not merely demonstate bad faith; it "bordered on the contumacious." *Red School House, Inc., v. Office of Economic Opportunity*, 386 F.Supp. 1177, 1193 (D.Minn.1974).

(7) *Failure to Obtain Competitive Data.* Although it set up the Monitoring Team at Lockheed pursuant to the March 1980 Order, defendant permitted Lockheed to perform SLEP on the first C–130's without collecting the type of records or reports that would have facilitated translation of SLEP data into kit form. *Aero II*, 540 F.Supp. at 189 n. 17. When an initial procurement is "necessarily noncompetitive," however, DAR 3–101(d) requires defendant to take "steps to foster competitive conditions for subsequent procurements, *particularly as to the availability of complete and accurate data*" (emphasis supplied). The failure to compile such data is another of defendant's repeated acts of inattention, misconstruction, and noncompliance with regulations, the GAO's advice, and the Court's orders that reflect a failure to consider possibilities of limited competition in good faith.

(8) *Reliance on Lockheed.* Defendant's "stubborn refusal" to consider in good faith the costs and benefits of a competition limited to experienced C–130 SDLM firms,

*Aero III*, 549 F.Supp. at 42, and defendant's excessive, and uncritical reliance on Lockheed, the prime C–130 SLEP competitor, for technical advice and expertise regarding SLEP are related factors indicating defendant's bad faith in the course of this litigation. Defendant's refusal to rationally calculate the costs and benefits of a limited SLEP competition has continually rested upon technical data and conclusions derived not by defendant but by Lockheed.

It is apparent, although not reassuring, that prior to *Aero I* the concept of a limited SLEP competition had never occurred to defendant, and its failure to consider it up to that point was the result of "inattention" to the statutory mandate to pursue competition whenever possible. *See Aero I*, 493 F.Supp. at 570. However in *Aero I*, the Court stressed that the possibility of a limited competition among experienced C–130 contractors should be examined. 493 F.Supp. at 568, 570. The GAO also made this concept the "lynchpin" of their recommendations. C.R. 84 at 5. Almost two years after the March 1980 Order, the Court informed defendant in *Aero II* that its efforts up to that point still did not constitute a rational consideration of limited competition, and specifically directed defendant to take steps "forthwith" to implement such a competition, until and unless a rational basis for refusing to do so could be demonstrated. 540 F.Supp. at 214, 219. The Court found that, despite the March 1980 Order, defendant had "never weighed the costs of . . . a limited competition against the savings that might be achieved through such a competitive procurement." *Id.* at 193, ¶ 16.[52]

---

**51.** The 1982 Order contemplated that the Navy would begin engineering plans at once for a limited kit-assisted SLEP competition. *See supra*, note 31. The 1982 Order did not provide that defendant could merely "review" or "re-evaluate" its old data and conclusions. Compare defendant's characterizations at C.R. 131 at 4; C.R. 133 at 15; C.R. 139 at 10. The proper course for curing any ambiguity that defendant now claims lay in the 1982 Order was to request clarification or reconsideration from the Court. *See infra* pp. 427–428.

**52.** Admiral Seymour recognized the necessity and relevance of a cost/savings calculation for any decision on SLEP competition in his September 1981 testimony. *See* C.R. 94 at 49. Admiral Seymour also estimated that labor "man-hours" would comprise between 30 and 40 percent of the cost of SLEP. C.R. 94 at 49–50. In light of the uncontested fact that plaintiff's labor costs were at that time only one-third of Lockheed's. 493 F.Supp. at 567, a cost/savings analysis of SLEP competition would appear on its face to be a fruitful endeavor. Yet Admiral Seymour admitted at that

Defendant's failure to consider a limited competition up to that point had largely been based upon advice from Lockheed, unevaluated by any independent source. For example, in late 1979, Lockheed's kit preparation time estimate changed from 46 to 60 or 64 months; defendant accepted that change with little apparent independent analysis, despite its alleged effect of foreclosing competition.[53] Lockheed was the first to suggest that experienced C–130 SDLM firms could not perform certain identical maintenance tasks in SLEP due to SLEP's "synergistic" character, C.R. A–12 at 8, and that the long lead times for SLEP parts effectively eliminated all potential competitors besides Lockheed. *Id.* at 12. Little or no evidence was offered to the Court to demonstrate that defendant ever independently tested the advice it received from Lockheed. Yet Lockheed was not a disinterested technical expert; it was a potential SLEP competitor, and its representatives made numerous filings with the GAO and observed the hearings in this case.[54]

The final example of defendant's over-reliance on Lockheed appears in the Navy's May 1982 Report to the Court. C.R. 129. Defendant reported that it had decided not to commence engineering for competition

for the remaining C–130 SLEP contracts, and it justified its decision not to compete almost entirely in reliance on Lockheed's advice. *See supra* p. 416; *Aero III,* 549 F.Supp. at 43. Plaintiff, conceded by defendant to be a qualified C–130 maintenance firm, has continually provided cogent criticisms of Lockheed's technical conclusions and judgments. Yet defendant has relied on Lockheed's contrary advice throughout this litigation, apparently without even attempting to locate or develop a disinterested third party for technical review. In light of Lockheed's obvious interested position, plaintiff's continual criticism of Lockheed's technical advice, and most importantly this Court's continued insistence that defendant, and not Lockheed, justify the Navy's noncompetitive decisions, defendant's continued and wholesale reliance on Lockheed for advice relevant to competition constitutes much more than simple inattention or naivete. It is another example of defendant's failure to pursue competition in good faith.

(9) *The "Mil-Specs" Confusion.* As has been suggested at various points, the meaning and significance of "military specifications" or "mil specs" has played an important role in this litigation.[55] Viewed as a

---

hearing that he had never made such calculations.

**53.** The military plant representative at Lockheed who did allegedly evaluate Lockheed's estimate stated that it may have been "exaggerated" by as much as 20 percent. C.R. A–13, Ex. AK. A reduction of the 60-month estimate by 20 percent might have permitted competition for SLEP of a substantial number of C–130's.

**54.** Lockheed has informed defendant that "Lockheed will not agree to become the technical supervisor or technical advisor to a competitor," and "will not direct or redirect its 'existing stocks' or provide its 'fabrication capability on the same priority basis (as it does to support its own SLEP installation program) in support of a competitive SLEP installation program.'" C.R. 129, Ex. 5 at 2; *see also id.* at 14; C.R. 92, Ex. 2. Lockheed has also reported that it can "only endorse the C–130 service life extension being performed by the prime contractor [i.e., Lockheed] or through [industry-wide] MIL-SPEC kits" (which it knew made competition impossible). C.R. 98, Ex. 2 at 3. These state-

ments, while indicative of natural business interest, must necessarily call into question the objectivity of advice that would affect defendant's decision to hold a competition for the SLEP procurement among other firms. Lockheed's technical expertise with regard to the C–130 aircraft is undeniable. Defendant's bad faith arises out of its uncritical reliance on Lockheed's advice, not from reliance on Lockheed *per se.*

Lockheed has never moved to intervene in this litigation and the Court has denied plaintiff's motions to make Lockheed a party. Full relief, in terms of termination of the SLEP contract and subsequent competition, has been available from the Navy alone. *See* F.R.Civ.P. 19(a).

**55.** Military specifications themselves are apparently two regulations that provide general guidelines for the military procurement of kits. These regulations are cited by defendant as "MIL–D–81992ZA(AS)" and "Aeronautical Requirement 41" (AR–41). *See* C.R. A–16, attachments 1 & 2. In the context of SLEP, mil specs provide terminology and requirements

whole and in context, the record permits no other finding than that defendant is responsible for any initial confusion regarding the meaning of "mil specs." [56] Subsequently, defendant has misstated the significance of the term, and has deliberately cultivated and depended upon the confusion to delay the litigation and consequently increase plaintiff's litigation costs. At bottom, defendant now relies on the confusion regarding "mil specs" to shield from view its failure to address the merits and to consider a limited SLEP competition using kits designed for experienced C–130 maintenance firms.[57] This obsfuscation carried on by defendant even into its most recent filings, see supra note 56, indicates bad faith that is unabated.

## B. *The Fee Award*

A major factor in the Court's decision to make a bad faith attorney's fee award in

for designing a competitive kit so that any contractor receiving a "mil spec kit" will understand what tasks are required and how they are to be performed. *Aero II,* 540 F.Supp. at 187; C.R. 94 at 45.

**56.** The Navy has provided the Court with shifting and conflicting definitions of "military specification" kits. For example, when the Court directed defendant to consider kits "tailored" to experienced C–130 maintenance firms in 1980, defendant informed the Court and the GAO that "mil spec" kits are "always tailored." The GAO relied on this representation in concluding that defendant could rationally require kits. C.R. 63 at 3. Lockheed then changed its position, and indicated to the GAO that its mil-spec kits would *not* be tailored, in the sense that that term has been used by the GAO, the Court, and the parties. *See* C.R. 84 at 4. Then the Navy began to refer to tailored kits as "non mil spec" kits, *e.g.* C.R. 133 at 8, a term that the Court has never used. Defendant also claims that it cannot be ordered to use "non mil spec" kits, C.R. 139 at 4, an order this Court has never attempted. The Court has only requested that defendant examine kits designed for a limited competition among experienced C–130 maintenance firms, and has never specified that defendant abandon its normal technical guidelines.

Even in its most recent filings, defendant has proffered conflicting definitions of "milspec kits." *Compare* C.R. 131 at 10 *with id.* at 6 n.*. The fact that two conflicting definitions of "mil spec kits" were presented by defendant in the same document suggests that it is the Navy, and not this Court, that labors "under some misconceptions regarding the composition of Mil Spec kits." C.R. 139 at 10.

**57.** The Court, in March 1980 and subsequently, has ordered defendant to consider "tailored kits" to be used in a "limited" SLEP competition among firms experienced with C–130 maintenance. The Court has never ordered defendant to abandon its use of mil specs, as defendant appears to contend, *see, e.g.,* C.R. 133 at 6; C.R. 129 at 7. The decision to use particular mil spec lies within the Navy's discretion and expertise. Although the phase "non mil specs kits" appears in defendant's filings, *see, e.g.,* C.R. 133 at 8; C.R. 139 at 4, 9, 10, it has never appeared in the opinions or orders of the Court, or been employed by the Court.

Defendant has represented on most occasions that mil specs "do not mandate a particular level of detail" for kits, C.R. 129 at 7, and that a mil spec kit "takes into account both the identity of the tasks to be performed *and the level of experience of the contractors who will be doing the work.*" C.R. 131 at 6 n.*; *see* Final Report, *supra* note 2 at § 8.3. (On other occasions the Navy has maintained an apparently contrary position. *See, e.g.,* C.R. 131 at 10.) This conforms with the common sense perception that *any* mil spec kit must presume a "lowest common denominator," that is, an assumed level of expertise on the part of the competing contractors, in order to place an outside limit on the scope of detail to be contained in the kit. *See* C.R. 94 at 76; C.R. 98, Ex. 2 ¶ 3. For example, as Admiral Seymour testified in September 1981, in a competition for overhaul work on aircraft, one might assume that all competitors will have certain parts already in their shops (thereby eliminating the necessity for including such parts in the kits), and a common understanding of various technical terms and concepts (that consequently need not be explained in the kits). *See* C.R. 94 at 57, 76–77. A necessary corollary to this concept is that, by positing a lowest common denominator of expertise for kits, the government will necessarily exclude from the universe of competitors those whose level of expertise falls below that which is presumed. For example, presuming a basic knowledge of aircraft maintenance when preparing SLEP kit will exclude from a SLEP competition all contractors without such knowledge. Raising the level of presumed expertise would exclude even some aircraft contractors from participating in competition.

Therefore, the concept of "tailored" mil spec kits is neither inconsistent with defendant's experience nor in conflict with defendant's own representations to the Court, and the Navy's failure to non-arbitrarily consider tailored kits and a limited SLEP competition cannot be excused on semantic grounds.

this case is the fact that defendant has never requested clarification or reconsideration from this Court regarding its orders, nor appealed any of those orders to a higher court. Absent an appeal or requests for clarification or reconsideration, defendant is under a legal obligation to comply with the Court's orders, and the Court is entitled to demand such compliance. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949). By choosing not to appeal or request clarification of previous orders, defendant acted at its peril, and cannot now claim that its actions were not "specifically enjoined" by the Court. *United States v. Mine Workers,* 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).

The presumed validity of unappealed orders and the requirement of compliance with them have a long tradition in the law. For example, the failure to appeal from a preliminary injunction generally bars a defendant from later contesting its validity or defending subsequent noncompliance by pleading disagreement with the original injunction.[58] Such a rationale may also underlie the Supreme Court's statement that "[t]he absence of willfulness does not relieve from civil contempt" for noncompliance with court orders. *McComb, supra,* 336 U.S. at 191, 69 S.Ct. at 499; *accord NLRB v. Local 282, Int'l. Bro. of Teamsters,* 428 F.2d 994, 1001 (2d Cir.1970); 11 *Wright & Miller, supra,* § 2960 at 591–92. Similarly, in a case such as this where the passage of time effectively served to deny plaintiff relief, defendant cannot now assert misunderstanding of or disagreement with Orders from which it did not appeal as justification for imposing unnecessary litigation costs on plaintiff.

Of course, a party "should not be penalized for merely defending ... a lawsuit," *F.D. Rich Co., supra,* 417 U.S. at 129, 94 S.Ct. at 2165, and "an award is not justified merely because the court found against a party on the facts." *Lipsig, supra,* 663 F.2d at 181 n. 21 (*citing Runyon v. McCrary,* 427 U.S. 160, 183–84, 96 S.Ct. 2586, 2600–2601, 49 L.Ed.2d 415 (1976)). But this is *not* a case in which a party has merely "stubbornly contested the facts." *Runyon v. McCrary,* 427 U.S. 160, 183, 96 S.Ct. 2586, 2601, 49 L.Ed.2d 415 (1976). Defendant has knowingly failed to follow legal requirements, reinforced by Court orders, that it consider competition in good faith. It has responded to Court orders in bad faith. Its failure to comply with the law, the GAO's advice, and the Court's orders in good faith, and the manner of its failure, fully justify an award of attorney's fees "unconnected with the merits of the case." *Wright v. Jackson,* 522 F.2d 955, 958 (4th Cir.1975); *accord Lipsig, supra,* 663 F.2d at 182.

An award of fees is not foreclosed even if defendant's defense of its noncompetitive SLEP decision was originally nonfrivolous and first posed as a result of an honest failure to appreciate its legal obligation to pursue competition of the SLEP procurement. *See Lipsig, supra,* 663 F.2d at 182. That failure should have been cured after the Court's decision in March 1980. The Court concludes that, viewing the defendant's actions as a whole during almost three years of litigation, the Navy, as opposed to government counsel that represented it before the Court, manifested the sort of bad faith that should be strongly sanctioned and deterred in future cases. *See Copeland v. Martinez,* 603 F.2d 981, 984 (D.C.Cir.1979), *cert. den.,* 444 U.S. 1044, 100 S.Ct. 730, 62 L.Ed.2d 729 (1980) (purpose of bad faith award is "punitive" and to "deter abusive litigation in the future").

Our Court of Appeals has noted that bad faith fee awards "must be limited, however, to payment for work and expense attributable to bad-faith endeavors." *Lipsig, supra,* 663 F.2d at 181 n. 21; *accord Browning*

---

**58.** *See, e.g., Maggio v. Zeitz,* 333 U.S. 56, 68, 68 S.Ct. 401, 407, 92 L.Ed. 476 (1948); *NLRB v. Union Nacional de Trabadores,* 611 F.2d 926, 928 n. 1 (1st Cir.1979); *Bethlehem Mines Corp. v. United Mine Workers,* 476 F.2d 860, 866–67 (3d Cir.1973); *AMF Inc. v. International Fiber-glass Co., Inc.,* 469 F.2d 1063, 1065 (1st Cir. 1972); *NLRB v. Local 282,* 428 F.2d 994, 999 (2d Cir.1970); *see generally* 11 *Wright & Miller, Federal Practice and Procedure* § 2960 at 593–98 (1973).

*Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1089 (2d Cir.1977). This is consonant with the punitive and the compensatory purpose of such an award. *Lipsig,* 663 F.2d at 181; *see also* Rowe, *The Legal Theory of Attorney Fee Shifting: A Critical Overview,* 1982 *Duke L.J.* 651, 660. The Court has concluded that defendant's bad faith did not reach sanctionable proportions until after the decision in *Aero I* was filed on March 4, 1980. Had defendant seriously begun at that time to evaluate in good faith the possibility of limited SLEP competition, using tailored kits, plaintiff likely would have had no cause or incentive for further litigation. But defendant's lack of good faith from that time forward has caused plaintiff unnecessary litigation expenses, not to mention the cost to the judicial system, the GAO, and the principle of competition.

Plaintiff should therefore submit a proposed Order together with appropriate affidavits and memoranda to support an award of reasonable attorney's fees and costs in this matter for the period from March 30, 1980, until the present. *See National Assoc. of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319 (D.C.Cir.1982) *(per curiam); Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir.1980) *(en banc).*[59] Defendant will be permitted to comment on plaintiff's submission, *see Lipsig, supra,* 663 F.2d at 182 n. 42; however, the Court will not permit the fee determination to develop beyond the "balanced, informed" proceeding contemplated by our Court of Appeals. *National Assoc. of Concerned Veterans, supra,* 675 F.2d at 1329.

An appropriate Order accompanies this Memorandum.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 15th day of February, 1983, hereby

ADJUDGED and DECLARED: that defendant has failed "in good faith to consider the feasibility of competitive procurement" for its Service Life Extension Program (SLEP) for certain C–130 aircraft in a rational or non-arbitrary manner, in violation of 10 U.S.C. § 2304(g), Defense Acquisition Regulation ¶ 3–101(d), recommendations of the General Accounting Office including opinions dated December 21, 1979, June 5, 1981, and September 9, 1981, and Orders of this Court including those entered on March 4, 1980, and February 18, 1982; and it is further

ORDERED: that defendant's Motion for Summary Judgment is DENIED; and it is further

ORDERED: that plaintiff's Motion for an Order to Show Cause Why Defendant Should Not be Held in Contempt is DENIED; and it is further

ORDERED: that plaintiff's Motion for Final Relief is GRANTED insofar as it seeks a notice injunction and award of attorney's fees against defendant; and it is further

ORDERED: that defendant shall publish a notice of any decision or recommendation made by its Acquisition Procurement Review Board or other decisionmaking authority to contract for procurement of SLEP service for any C–130 aircraft operated by defendant in the *Commerce Business Daily,* "Synopsis of U.S. Government Proposed Procurement Sales and Contract Awards" within 20 days of such decision or recommendation; and it is further

ADJUDGED and DECLARED: that, since at least March 4, 1980, defendant (but not the Department of Justice or the United States Attorney) conducted this litigation in furtherance of its violations of the statute, regulations, Court Orders and recommendations of the Acting Comptroller General, and (for this and other reasons detailed in the accompanying Memorandum) acted in bad faith, causing plaintiff to incur attorney's fees that it would not otherwise have incurred; and it is further

---

**59.** The Equal Access to Justice Act expressly provides that "if the basis for [an attorney's fee] award is a finding that the United States acted in bad faith, then the award shall be paid by any agency found to have acted in bad faith." 28 U.S.C. § 2412(c)(2) (Supp. V 1981).

ADJUDGED and DECLARED: that plaintiff is entitled to an award of reasonable attorney's fees and costs from defendant for legal services rendered to it in connection with this litigation from March 5, 1980, through February 15, 1983; and it is further

ORDERED: that on or before February 28, 1983, plaintiff shall submit an appropriate application for judgment together with a proposed form of judgment (if it so desires) for the attorney's fees to which it claims to be entitled by this Order; and it is further

ORDERED: that on or before March 7, 1983, defendant shall file its comments, if any, on any attorney's fees application filed by plaintiff.